9/17/2019 12:09 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 36875829
By: Charlie Tezeno
Filed: 9/17/2019 12:09 PM

## 2019-67421 / Court: 129

CAUSE NO. _____

| | | |
|---|---|---|
| XTO ENERGY INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | _____ JUDICIAL DISTRICT |
| | § | |
| MEC SERVICES, LLC AND NEW | § | |
| YORK MARINE AND GENERAL | § | |
| INSURANCE COMPANY, | § | |
| | § | HARRIS COUNTY, TEXAS |
| **Defendants.** | § | |

### PLAINTIFF'S ORIGINAL PETITION FOR DECLARATORY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff XTO Energy Inc. ("**Plaintiff**") files its Original Petition for Declaratory Judgment against Defendant MEC Services, LLC ("**MEC**") and New York Marine and General Insurance Company ("**NYMAGIC**") (together, "**Defendants**") and respectfully shows the Court as follows:

#### I.     NATURE OF THE ACTION

1.     This is a request for declaratory judgment. XTO and MEC entered into a Master Service Agreement ("**MSA**") in which MEC agreed to release, defend, indemnify and hold harmless XTO from any and all claims for *inter alia* personal injury in any manner incident to, connected with, or arising out of work performed by MEC pursuant to the MSA, in addition to naming XTO as an additional insured on the insurance policies provided by NYMAGIC.

2.     XTO seeks a declaration from the Court that MEC is required to provide a defense and indemnity pursuant to the MSA in connection with the underlying lawsuit described below.

3.     Plaintiff further seeks a declaration from this Court that NYMAGIC is obligated to provide a defense and coverage for XTO in connection with the underlying lawsuit because XTO

1

is included as an additional insured on the relevant insurance policies issued to MEC by NYMAGIC.

## II.    DISCOVERY LEVEL

4.      XTO intends to conduct discovery under Level 3 of the Texas Rule of Civil Procedure 190.4.

## III.    PARTIES

5.      Plaintiff XTO is a Delaware corporation with its principal place of business located at 22777 Springwoods Valley Parkway, Spring, Texas, 77389.

6.      Defendant MEC is a limited liability company formed under New Mexico law. MEC may be served with process through the Texas Secretary of State through its registered agent, Mark Comer, 3791 Southern Blvd., Suite 260, Rio Rancho, New Mexico 87124, or wherever he may be found.

7.      Defendant NYMAGIC is a foreign corporation incorporated in the State of New York, doing business in the State of Texas. NYMAGIC may be served with process by serving its registered agent, Corporation Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218, or wherever it may be found.

## IV.    JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action under Chapter 37 of the Tex. Civ. Prac. & Rem. Code and because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

9.      Venue is proper in Harris County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(4) and §15.032 because Harris County is where Plaintiff XTO resided at the time of the accrual of the cause of action.

10.     The damages and other relief sought herein are within the jurisdictional limits of this Court.

## V.     CONDITIONS PRECEDENT

11.     All conditions precedent have been performed and/or have occurred.

## VI.     FACTS

**The Indemnity Provision in the MSA**

12.     On or around March 8, 2017, XTO—a company based in the State of Texas—and MEC entered into the MSA, which controls and governs all work MEC performs for XTO, without regard to whether it was provided or performed pursuant to a written or oral work order (the "**Work**"). *See* MSA, Article I and Sections 2.3, 2.8–.9. A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

13.     The MSA is governed by the laws of the State of Texas. *See* MSA, Section 14.8.

14.     The MSA requires MEC to release, defend, indemnify and hold harmless XTO from any and all claims arising out of any physical injury, illness, and/or death of any member of MEC Contractor Group in any manner incident to, connected with, or arising out of the performance of Work (the "**Indemnifiable Claims**"). *See* MSA, Section 10.1.1.

15.     The MSA further obligates MEC to release, defend, indemnify and hold harmless XTO, without regard to the cause of the Indemnifiable Claims, and includes Indemnifiable Claims that result from sole, gross, joint, or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any member of XTO. *See* MSA, Section 10.1.1.

16.     MEC's contractual duty to defend and indemnify XTO pursuant to Section 10.1.1 of the MSA is to be performed in Harris County, Texas.

3

**Insurance Coverage**

17.    The MSA also requires MEC to secure and maintain several insurance policies, including commercial general liability insurance and umbrella liability insurance policies (the "**Insurance Policies**"). *See* MSA, Article XI.

18.    The Agreement requires that all Insurance Policies extend to and protect XTO as an Additional Insured, to the full extent and amount of MEC's coverage under the Insurance Policies, and that all such Insurance Policies are primary to, and receive no contribution from, any other insurance or self-insurance program maintained by, on behalf of, or benefitting XTO. *See* MSA, Section 11.4.

19.    MEC obtained insurance pursuant to the MSA from the Texas-based insurance broker Arthur J. Gallagher & Co., located at Six Desta Dr., Ste. 590, Midland, Texas 79705.

20.    The MSA requires MEC to furnish a Certificate of Insurance of the Insurance Policies to XTO, as evidence that the required insurance coverage has been obtained and maintained, before Work may commence. *See* MSA, Section 11.5.

21.    The Certificate of Insurance issued to XTO pursuant to Section 11.5 of the MSA names NYMAGIC as the general commercial liability and umbrella liability insurer.

22.    Lastly, the Agreement requires that MEC shall be the employer or common law employer of all personnel performing the Work. *See* MSA, Article XII. The Agreement expressly disclaims that any member of MEC or its respective workers, officers, employees, or agents will be deemed the agent, representative, employee, common law employee or servant of XTO. *See* MSA, Article XII.

4

**The Texas Lawsuit**

23.     On August 26, 2019, XTO and MEC were named as defendants in a lawsuit styled *Francisco Maldonado v. XTO Energy Inc. and MEC Services, LLC*, in the 165th Judicial District, Harris County, Texas, Cause No. 2019-58891 (the "**Lawsuit**"). In plaintiff Francisco Maldonado's ("**Maldonado**") Original Petition, he alleges that he sustained physical injury while performing work for MEC and XTO. The work Maldonado alleges he was doing that forms the basis of his claims was performed at least in part in the State of Texas. A true and correct copy of the Original Petition is attached hereto as **Exhibit B**.

24.     Any work performed by Maldonado and forming the basis of his claims against XTO was Work performed by MEC pursuant to the MSA, thereby triggering MEC's and NYMAGIC's duty to provide a defense and indemnity/coverage to XTO.

25.     Accordingly, XTO has made a demand on NYMAGIC for a defense and coverage pursuant to XTO's status as an Additional Insured on the Insurance Policies.

26.     Further, XTO has made a demand on MEC for a defense and indemnity pursuant to the indemnity provision in the MSA. The demand letters are attached hereto as **Exhibit C**.

27.     As of the filing of this declaratory judgment action, Defendants have not provided a defense and indemnity/coverage to XTO.

## VII.     DECLARATORY JUDGMENT ACTION AGAINST MEC

28.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

29.     In accordance with Section 37.001, et seq., of the Texas Civil Practice and Remedies Code, XTO seeks a declaratory judgment declaring the scope of MEC's obligations relating to the Indemnifiable Claims as set forth under the Agreement.

30.     XTO seeks a declaration that MEC is obligated to provide XTO with a complete defense and indemnification for the Lawsuit.

## VIII.   DECLARATORY JUDGMENT ACTION AGAINST NYMAGIC

31.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

32.     In accordance with Section 37.001, et seq., of the Texas Civil Practice and Remedies Code, XTO seeks a declaration of NYMAGIC's obligation to defend and provide coverage to XTO in the Lawsuit pursuant to XTO's status as an Additional Insured on the Insurance Policies.

33.     XTO seeks a declaration that the NYMAGIC is required to provide XTO with a defense and coverage for the Lawsuit.

## IX.     ATTORNEYS' FEES AND EXPENSES

34.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

35.     In order to enforce its rights against Defendants, XTO has been forced to retain the undersigned counsel. XTO therefore seeks to recover costs, including reasonable attorneys' fees, experts' fees, pre-judgment interest and post-judgment interest, incurred in prosecuting and defending the claims described herein.

## X.     PRAYER

WHEREFORE, Plaintiff XTO Energy Inc. prays that Defendants MEC Services, LLC and New York Marine and General Insurance Company be cited to appear and answer and that the Court enter a final judgment against them for the following:

      a.  Declaratory relief as specified above.

      b.  Pre- and post-judgment interest as allowed by law.

      c.  Court costs and attorneys' fees for pursuing this lawsuit.

6

d.  All other relief to which Plaintiff XTO Energy Inc. may be justly entitled.

Dated: 17th day of September, 2019.

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Michael T. Murphy*
Michael T. Murphy
Texas State Bar No. 24051098
michael.t.murphy@klgates.com
Jason P. Rudloff
State Bar No. 24098356
jason.rudloff@klgates.com
Hannah T. Warren
State Bar No. 24098356
hannah.warren@klgates.com
K&L GATES, LLP
1000 Main Street, Suite 2550
Houston, Texas  77002
Telephone:  (713) 815-7360
Facsimile:  (713) 815-7301

**ATTORNEYS  FOR  DEFENDANTS  XTO
ENERGY INC.**

2019-67421 / Court: 129

# Exhibit A

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

THIS MASTER SERVICE AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, RELEASE OF LIABILITY AND ALLOCATION OF RISK. BY EXECUTING THIS MASTER SERVICE AGREEMENT AND/OR COMMENCING THE WORK, XTO ENERGY INC. AND ITS LISTED AFFILIATES AND CONTRACTOR AGREE TO BE BOUND BY ALL OF THESE PROVISIONS.

## MASTER SERVICE AGREEMENT

THIS MASTER SERVICE AGREEMENT is made and entered into on March 8, 2017     , between **XTO ENERGY INC. and its affiliates, BARNETT GATHERING, LLC; ENGLISH BAY PIPELINE, LLC; FAYETTEVILLE GATHERING COMPANY; MOUNTAIN GATHERING, LLC; NESSON GATHERING SYSTEM, LLC; RINGWOOD GATHERING COMPANY; TREND GATHERING, & TREATING, LLC; and TIMBERLAND GATHERING, & PROCESSING COMPANY, LLC** (individually and collectively "XTO"), legal entities having their principal places of business at 810 Houston St., Fort Worth, TX 76102, and **M.E.C. Services**
a  LLC              having its principal place of business at 522 W. Mermod Street #721, Carlsbad, NM, 88220 ("Contractor"). XTO and Contractor are referred to herein individually as a "Party" and collectively as the "Parties."

The Parties acknowledge and agree as follows:

I.      Preamble.  This Master Service Agreement controls and governs the Work (as defined below) performed by Contractor Group (as defined below) for XTO. It may be used in conjunction with oral or written Work Orders (as defined below) between the parties. Only the particular terms included in this Master Service Agreement that have application to the type of Work that is covered by a particular Work Order will apply.  This Master Service Agreement does not obligate XTO to order Work from Contractor and does not obligate Contractor to accept orders for Work from XTO.

II.     Definitions.

2.1     "Affiliate" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlling, controlled by, or under common control with such Party

2.2     "Agreement" means this Master Service Agreement and any oral or written Work Orders between the Parties.

2.3     "Contractor Group" shall mean individually or in any combination Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees, invitees and assignees.

2.4     "Master Service Agreement" means this document standing alone.

2.5     "Site" means the location or locations at which Contractor is performing the Work for XTO.

2.6     "Subcontractor" means a party that Contractor engages to perform all or a part of the Work.  References to Contractor in this Agreement will include, where appropriate, Contractor's Subcontractors.

2.7     "Subsidiary" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlled by such Party.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

2.8     "XTO Group" shall mean individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Contractor, Contractor Group, or its or their Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.

2.9     "Work" means everything to be provided or performed by the Contractor Group from time to time under this Master Service Agreement, or which has been provided or performed by Contractor Group, whether with or without a particular written or oral Work Order.

2.10     "Work Order" means the directions from XTO to Contractor, which may be oral (which may be followed by a writing within ten (10) days of the oral request) or written, to provide or furnish XTO with equipment (including, without limitation, equipment fabricated by the Contractor Group), material or services at a specific time, place and cost; such directions are incorporated in this Master Service Agreement by reference.

## III.    Conduct of Work.

3.1     <u>Commencement of Work</u>.  When the terms of a Work Order for the materials, services and/or equipment desired by XTO are agreed upon, Contractor will commence furnishing same at the agreed time, and continue such operations safely, diligently and without delay, in strict conformity with the specifications and requirements contained herein and in such Work Order until complete.

3.2     <u>Time and Quality</u>. Time and quality of work shall be the essence of this Agreement.

## IV.    Responsibilities of the Parties.

4.1     <u>Contractor's Responsibilities</u>.  Contractor, at its sole cost, risk and expense, will:

     4.1.1    Furnish the services of all personnel required to perform and complete the Work.

     4.1.2    Supply all machinery, equipment, tools, materials and expendable construction items, transportation, and supplies that are required to perform and complete the Work, unless XTO has agreed in writing to supply such materials and equipment.

     4.1.3    Provide all necessary safeguards for the protection of all aspects of the Work and all persons employed directly or indirectly by the Contractor Group or third parties.

     4.1.4    Obtain and provide evidence to XTO of all permits and licenses that are required to perform the Work, except for air permits and EPA permits.

     4.1.5    Pay (i) any occupation or similar taxes which arise from the Work and which are required under the law or for which XTO has elected not to give the Contractor a direct pay certificate or other valid exemption certificate; (ii) all payroll taxes, all taxes measured by payrolls, all assessments or charges for social security purposes, unemployment compensation, old-age pensions or benefits, annuities or other charges that are required to be made with respect to or measured by the wages and salaries of persons employed by the Contractor Group that are imposed by or under the laws of either the United States or State in which the Work is performed; and (iii) for all labor and materials furnished by the Contractor Group for the Work.  Contractor shall protect, defend, indemnify and

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

hold harmless the XTO Group from and against the failure of any member of the Contractor Group to pay such taxes. Contractor agrees to require this same agreement from each member of the Contractor Group and to indemnify the XTO Group for any breach or failure to obtain such agreements.

4.1.6    Immediately notify XTO of any incident arising out of or relating to the Work resulting in death or personal injury to any person or property damage or loss, including, but not limited to, environmental damages or losses, and will furnish XTO a written report within 72 hours of the incident detailing all relevant facts. Contractor will furnish XTO with a copy of all documents made by Contractor to any insurer or governmental authority regarding such accidents or occurrences.

4.1.7    Be responsible for: (i) the training, supervision and safety of all persons within the Contractor Group who are performing the Work, (ii) the Work performed and (iii) all materials, services and equipment provided by the Contractor Group or any member thereof, and any vendor or supplier of the Contractor Group incidental to the Work.

4.1.8    If applicable, in accordance with the Occupational Safety and Health Administration's Hazard Communication Standard, 29 CFR 1910.1200, Contractor shall provide to XTO all Material Safety Data Sheets (MSDS) applicable to the equipment/materials purchased at or before the time of the initial shipment. All updates to such MSDS shall be provided to XTO with the first shipment after updating.

4.2    XTO's Responsibilities. XTO will:

4.2.1    Furnish materials and equipment that XTO has agreed to furnish.

4.2.2    Provide access to the Site.

4.2.3    Provide other goods and/or services as agreed in writing by the Parties.

V.    Payment and Audit Rights.

5.1    Contract Price. XTO will pay Contractor for the Work based on the rate and terms in the Work Orders. Unless otherwise provided in this Agreement and subject to Article IX hereof and retention rights permitted by law, payment will be due 30 days after XTO's receipt of a correct invoice and supporting documentation therefor.

5.2    Audit Rights. Contractor will preserve documentation related to a Work Order for three years after completion of the Work Order. XTO may audit Contractor's compliance with this Agreement and any Work Order hereunder and Contractor will provide XTO access to Contractor's documentation, personnel and facilities in support of any such audit and will permit XTO to reproduce any of the documentation. Contractor will cause any subcontractors to preserve documentation and allow XTO to audit to the same extent. XTO will bear its own costs to perform an audit, but will not be liable for Contractor's or subcontractor's costs resulting from an audit.

VI.    Work Standards, Warranties, Quality, Title and Storage

6.1    Work Standards. All Work by the Contractor Group will be performed with due diligence, in a good, safe and workmanlike manner, using skilled, competent and experienced workers and supervisors and in accordance with good oilfield servicing or other applicable business or professional practices. All materials, equipment, supplies or

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

manufactured articles furnished, fabricated or used by the Contractor Group in the performance of the Work will be selected and used with good oilfield or other applicable business or professional practices for their respective purposes, and shall be of first quality. Contractor agrees to ascertain, before performing any Work, whether any drawings and specifications are at variance with applicable law and good engineering and operational practices, notify XTO of such variances, and with XTO's agreement ensure that any necessary changes are made.

6.2    XTO Provided Equipment. Contractor agrees to inspect all materials and equipment furnished by XTO and will notify XTO of any apparent defects therein before using the materials and equipment. Should the Contractor Group use such materials and equipment without notifying XTO of any such defect, Contractor will be deemed to have assumed all risk and liability for any mishap that may occur in operations conducted hereunder by reason of failure or defects in such material and equipment. Contractor will not be liable for claims due solely to latent defects.

6.3    Warranties.

    6.3.1    Services. For services provided, Contractor warrants that the Work will be and has been completed in accordance with this Agreement, the applicable Work Order, and the most current applicable codes and industry standards, using its best professional efforts and in accordance with the most current generally accepted standards in the applicable industry, business or profession.

    6.3.2    Equipment/Materials. For equipment and materials purchased or leased by XTO from the Contractor Group, Contractor, in addition to the other provisions hereof, warrants (i) that the equipment and materials will be free and clear of all liens, taxes, security interests or encumbrances; (ii) good and merchantable title to the equipment and materials; (iii) that the equipment and materials will be free from defects in material and workmanship for a period of 12 months following the date of installation, or the Contractor or manufacturer's standard warranty, whichever is longer; (iv) that the equipment and materials will conform to applicable specifications, drawings, designs, and samples; (v) that the equipment and materials will be fit for their usual, customary, and generally intended purpose; and (vi) with respect to non-custom equipment and materials, that such equipment and materials will be of no less than ordinary quality.

    6.3.3    In addition to the express warranties set forth above, the Work and all equipment and materials will be covered by all implied warranties available at law.

    6.3.4    In addition to all rights and remedies available to XTO by law, all of which are reserved, if XTO discovers any defect or deficiency in the Work within the warranty period, and XTO has notified Contractor of the defect or deficiency within a reasonable period of time after its discovery, Contractor, at its sole expense and risk, shall at XTO's option either (1) promptly repair, re-perform, or replace the defective or deficient Work (and shall provide all labor, materials, equipment and other services necessarily incidental to effecting such correction of the defect or deficiency) or (2) refund any payments made by XTO for the Work. The repaired, re-performed, or replaced Work shall be warranted on the same basis as provided above for the longer of the balance of the applicable warranty period or 6 months from the date XTO accepts the repair, re-performance, or replacement.

    6.3.5    Warranties of Others. Contractor shall use its best efforts to ensure that any warranties available from Subcontractors or manufacturers are assigned or otherwise made available to XTO, and shall upon request deliver to XTO a copy

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

of each written warranty provided by Subcontractors, manufacturers, or any other third parties. If a warranty from Subcontractor, manufacturer, or third party cannot be assigned to XTO, Contractor shall bring and diligently pursue a warranty claim for XTO's benefit if XTO so requests.

6.4    <u>Title; Risk of Loss</u>. Title to any equipment and materials (excluding Contractor's tools, equipment and rented items) provided under this Agreement will pass to XTO: (i) upon payment therefor by XTO; or (ii) upon delivery to XTO's premises, agent or other site designated by XTO, whichever occurs earlier. Risk of loss or damage to equipment and materials shall pass to XTO upon delivery to XTO's premises or an agent designated by XTO. Notwithstanding the foregoing, the transfer of title or risk of loss to XTO does not constitute XTO's acceptance of any equipment and materials.

6.5    <u>Storage and Bailment of XTO's Equipment and Materials</u>. If Contractor stores any of XTO's materials and/or equipment under one or more Work Orders, Contractor shall keep and provide those records that may be requested by XTO including, but not limited to, an inventory of such materials and/or equipment, by location, at the end of each calendar year, or more frequently if requested by XTO. Contractor may charge XTO a fee for storing the materials and/or equipment only if that fee is agreed to by XTO in writing. Contractor shall: (i) store such materials and/or equipment in a clean, dry, and secure location, unless otherwise agreed in writing by XTO, (ii) segregate such materials and/or equipment from items belonging to entities other than XTO, if the materials are of a nature which may be segregated, and (iii) mark, or otherwise indicate in a manner to make it evident to Contractor's creditors, that such materials and/or equipment belong to XTO. XTO shall have access to such materials and/or equipment during Contractor's normal business hours, and Contractor shall use reasonable commercial efforts to provide XTO access to such materials, when requested by XTO, during non-business hours. Delivery of XTO's materials and/or equipment is considered by both parties to be a bailment and not subject to the terms and conditions of the Uniform Commercial Code or similar law, as the same may be codified in applicable state law pertaining to sales and/or secured transactions. If materials and/or equipment stored by Contractor under one or more Work Orders are lost, stolen or damaged, Contractor shall be responsible for the full replacement value of such materials and/or equipment. If the Contractor stores any of XTO's materials and/or equipment, Contractor assumes all risk and liability for any property damage to the material and/or equipment during the period of such storage.

VII.    <u>Patents, Software and Infringement</u>.

7.1    Contractor represents and warrants that the use or construction of any and all tools, equipment and other materials furnished by the Contractor Group and used in the Work does not infringe on any license or patent issued to, or applied for by, a third party.

7.2    If equipment or materials are provided with embedded or included software or firmware, whether created by Contractor or a third party, Contractor grants to XTO a perpetual, royalty-free, worldwide and irrevocable right to use the software in connection with use of the equipment or materials, which right is extendable to any person or entity permitted by XTO to use the equipment or materials and which is fully transferable in connection with any sale or other transfer of the equipment or materials. If access to or use of the software or firmware requires XTO to "accept" terms and conditions through use of "click-wrap", "shrink-wrap" or any other means, XTO may "accept" in order to access or use the software or firmware, however such terms and conditions will be of no force or effect and XTO's use rights shall be governed solely by this Agreement. Embedded or included software or firmware shall be treated as "equipment or materials" for all purposes.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

7.3   **Infringement Notice and Indemnification**. If any member of the XTO Group, or an **Affiliate**, is made the subject of any claim or lawsuit based on the alleged **infringement or misappropriation of any third-party patent, copyright, trade secret or other proprietary or intellectual property right by reason of any aspect of the Work provided by the Contractor Group hereunder, Contractor shall defend, indemnify and hold harmless the XTO Group against any and all claims or lawsuits arising out of or based on the actual or alleged infringement or misappropriation of any such third-party right by Contractor Group. The indemnities set forth in this Section shall include, without limitation, all penalties, awards, and judgments; all court and/or arbitration costs; legal costs and the costs of defense; and other reasonable out-of-pocket costs, fees or expenses incurred in connection with such claims or lawsuits.** Contractor shall have the right to control the defense of any litigation, and to settle or compromise all claims and lawsuits subject to its indemnity; however, Contractor may not settle or compromise such claim or lawsuit without the written consent of XTO if any settlement or compromise (a) requires XTO to admit fault or wrongdoing, or to part with any property right or interest, assume any obligation or make any payment not indemnified, or (b) subjects XTO or XTO Affiliate to any injunction. Subject to the foregoing, XTO shall have the right, at its option and expense, but not the obligation, to retain advisory counsel to represent its interests in defending any such claim or lawsuit.

If any action results in an injunction against any member of XTO Group with respect to the Work performed under any Work Order, Contractor agrees that it shall, at its sole expense, either (1) procure for XTO the right to continue using the infringing subject matter, or (2) replace or modify the same so that it becomes non-infringing with substantially equivalent performance. If neither (1) nor (2) are possible, Contractor shall refund to XTO all amounts paid under the applicable Work Order.

VIII.   Confidentiality. Contractor will treat, and will cause the Contractor Group to treat, all information obtained in the performance of the Work as confidential, and Contractor will not, and will ensure that the Contractor Group will not, divulge such information to any person or entity without the prior written consent of XTO. Contractor will not, and Contractor will ensure that the Contractor Group will not, use any such information except in connection with the Work and will not disclose details of the Work to any third party except to those who are to perform the Work, and then only to the extent that it is required to perform the particular portion of the Work. Contractor will take, and Contractor will ensure that the Contractor Group will take, all reasonable precautions to safeguard any documents containing proprietary information. The restrictions in this Section VIII shall not apply to any information: (i) which is at the time of disclosure in, or after disclosure falls into, the public domain through no fault of Contractor or any member of the Contractor Group; (ii) which is first received by Contractor from a third party who, insofar as is known to Contractor, is lawfully in possession of such information and not in breach of any contractual, legal or fiduciary obligation to XTO or the XTO Group; and (iii) disclosure of which, upon advice of counsel, Contractor reasonably deems necessary to comply with any legal or regulatory obligation which Contractor believes in good faith it has. If either Party or anyone to whom it transmits confidential information pursuant to this Agreement becomes legally required to disclose any such information, that Party shall provide the other Party with prompt written notice so that it may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the disclosing Party shall furnish only that portion of the confidential information which is legally required to be furnished in the opinion of the disclosing Party's counsel and no more.

IX.   Liens. Contractor will make timely and full payments to all workmen, materialmen and Subcontractors, insure that all members of the Contractor Group make timely and full payments to all workmen, materialmen and Subcontractors, and take all other action necessary to keep the Site and the Work free of liens. Contractor agrees to indemnify, protect, defend and hold harmless the XTO Group from and against all such charges, claims and liens unless caused by XTO's failure to pay Contractor. XTO may withhold payment of amounts due to any member of the Contractor

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

Group under this Agreement (including the applicable Work Order and any other Work Orders) and any other contract between XTO and Contractor until XTO has been furnished with proof satisfactory to it that either all amounts have been paid or Contractor has provided for satisfactory payment. If a lien arising from the Work attaches to the Site or the Work, XTO may, at its sole option, make any payment necessary to discharge the lien, and it may offset the amount of the lien, together with damages and costs, including court costs and reasonable attorneys' fees, that it incurs because of the lien or its discharge against any payment owing or to be owed to Contractor or any other member of the Contractor Group. Contractor will furnish, on request by XTO, receipts and releases with respect to the Work that show that costs and expenses of the Work have been paid and that no claims, liens, or rights to liens exist against the XTO Group or its property. Contractor agrees to require this same agreement from each of its Subcontractors and to defend and indemnify the XTO Group for any breach of such agreements by any of its Subcontractors.

## X.   RELEASE, DEFENSE, INDEMNITY AND HOLD HARMLESS.

### 10.1   Contractor's Obligations.

10.1.1   Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "Indemnifiable Claims") arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the Contractor Group, and/or loss of or damage to property or interests in property of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group.

10.1.2   To the extent not covered in Section 10.3, Contractor hereby further agrees to protect, release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

10.1.3   Contractor agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group and shall provide waivers of subrogation against all members of the XTO Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

10.2    **XTO's Obligations.**

    10.2.1   XTO hereby agrees to release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group, and/or loss of or damage to property or interests in property of any one or more members of the XTO Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group.

    10.2.2   To the extent not covered in Section 10.3, XTO hereby further agrees to protect, release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

    10.2.3   XTO agrees that its indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group and shall provide waivers of subrogation against all members of the Contractor Group; or XTO may be self-insured. To the extent that applicable law prohibits monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

10.3    **Drilling of Oil or Gas Well.** Notwithstanding any provision in this Article X to the contrary (but expressly subject to Section 10.3.4 hereof) the following provisions will apply to operations involved in the drilling of an oil or gas well:

    10.3.1   XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising from pollution or contamination below the surface of the land, seabed or water, resulting from blowout, fire, cratering, seepage or any other uncontrolled flow of oil, gas or mineral substance during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

    10.3.2   XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against the loss or damage (i) to any geological formation, strata or oil or gas reservoir or minerals resource beneath the surface of the land or water, (ii) for the loss of or damage to any hole(s) or well(s), and (iii) for any impairment of any property rights or other interests in or to any oil, gas or minerals resources resulting from blowout, fire, cratering or any other cause, which may result during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

10.3.3   If equipment or instruments of the Contractor Group become lost in the well, XTO will either recover them without cost to the Contractor Group or pay the Contractor Group for the equipment or instruments (depreciated to date of loss); PROVIDED, HOWEVER, IF THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE CONTRACTOR GROUP, XTO WILL NOT BE LIABLE TO ANY EXTENT FOR THE LOSS AND THE CONTRACTOR GROUP WILL RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE XTO GROUP FROM AND AGAINST ANY LOSS, COST OR EXPENSE, INCLUDING COURT COSTS AND REASONABLE ATTORNEY'S FEES, SUFFERED OR INCURRED BY THE XTO GROUP THAT ARISES OR RESULTS THEREFROM. Contractor will be required to furnish backup documentation to support the calculation of reimbursable costs for equipment or instruments lost in the hole.

10.3.4   To the extent any provision in this Section 10.3 applicable to the drilling of an oil or gas well is in conflict with any other provision of this Article X, then such provision of this Section 10.3 will prevail, but if there is no such conflict the entire Article X will apply.

10.4   SPECIAL PROVISION FOR NEW MEXICO AND WYOMING.   THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO OR WYOMING, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY.   To the extent this Article X is governed by New Mexico or Wyoming law, then the provisions therein shall be read not to include indemnification for one's own negligence, gross negligence or willful misconduct.

10.5   SPECIAL PROVISIONS FOR LOUISIANA. THE FOLLOWING PROVISIONS APPLY WHERE WORK IS TO BE PERFORMED IN OR OFFSHORE LOUISIANA, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY.

10.5.1   To the extent Article X is governed by Louisiana law, then (1) the provisions therein shall be read not to include indemnification for one's own negligence and (2) the Indemnifiable Claims for which indemnity is owed, pursuant to Article 10.1, and 10.2.1, shall include claims arising out of contractual indemnity obligations owed to Contractor Group or XTO Group, as applicable.

10.5.2   The Parties acknowledge and agree that all Work performed by Contractor and its employees pursuant to this Agreement is an integral part of and is essential to the ability of XTO to generate XTO's goods, products or services. Without limiting the foregoing, XTO and Contractor agree that XTO is and will be deemed a statutory employer of Contractor's employees for purposes of La. R.S. 23:1061(A)(3), as the same may be amended from time to time. In further consideration of the amounts to be received by Contractor pursuant to this Agreement, XTO and Contractor agree that Contractor will be responsible for the payment of all compensation benefits paid to or for the benefit of Contractor's employees. Contractor and/or Contractor's underwriters agree that they will have no right to seek and will not seek any contribution or indemnity from XTO for any compensation benefits paid by Contractor and/or Contractor's underwriters.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

XI.     Insurance.

    11.1     Coverages.  Subject to the provisions of Section 11.2, Contractor will secure and maintain, and will require its Subcontractors to secure and maintain, during the term of this Agreement the following insurance coverages with limits not less than the amounts specified, and with companies satisfactory to XTO who are authorized to do business in the jurisdiction where the Work is to be performed.

        11.1.1     Worker's Compensation Insurance with limits of not less than $1,000,000 or the statutory requirements of State laws (as well as Federal laws, if applicable), whichever is greater, which shall include Employer's Liability Insurance with limits of not less than $500,000 per incident.  If the Work is to be performed in the states of North Dakota, Ohio, Washington or Wyoming, "Stop-Gap" Employer's Liability Insurance with limits of not less than $500,000 per incident must be procured. Such Worker's Compensation insurance must be endorsed, if applicable, to cover claims under the United States Longshore and Harbor Workers' Compensation Act, the Outer Continental Shelf Lands Act, the Jones Act and general maritime law, with an "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam."

        11.1.2     Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

        11.1.3     Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by Contractor, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence.

        11.1.4     Umbrella Insurance (with coverage at least as broad as the underlying policy) over that required in 11.1.2 and 11.1.3 with minimum limits of $5,000,000, and specifically including contractual liability.

        11.1.5     If the Work requires the use of marine vessels or other watercraft, Contractor will carry, or require the owner of the watercraft to carry: (i) all risk hull insurance in an amount equal to the vessel's declared value and (ii) protection and indemnity insurance, including, but not limited to, collision liability, removal of debris, towing liability and coverage for Admiralty benefits and damages under the Jones Act and general maritime law, in a minimum amount of $1,000,000 combined single limit per occurrence, and that in all such insurance the "other than owner clause" will be deleted.

        11.1.6     If the Work requires the use of aircraft, Contractor will carry, or require the owner of the aircraft to carry: (i) all risks hull insurance in the amount equal to the replacement value of the aircraft and (ii) bodily injury liability, including passenger liability and property damage, of not less than $10,000,000 combined single limit per occurrence.

    11.2     Actual Insurance.  Notwithstanding the minimum coverages specified in Sections 11.1.1-11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor shall provide hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1-11.1.5 above.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

11.3    Limit Adjustments. XTO may at any time upon prior written notice require Contractor to increase the limits set forth to such amounts as inflation, industry practice or other factors indicate are reasonable. The foregoing insurance requirements will apply whether or not required by any other provision of this Agreement and the limits of coverage do not alter the indemnities and allocation of responsibilities in this Agreement.

11.4    Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

11.5    Certificate of Insurance. Contractor or Contractor's insurance carrier(s) will furnish certificates of insurance satisfactory to XTO, reflecting the insurance requirements of this Article XI, as evidence that the required insurance coverage has been obtained and maintained, before commencing the Work. The certificate shall be on a form approved by the Texas Department of Insurance.

No waiver of the provisions of this Article XI will be inferred from any failure on the part of XTO to object or complain about any failure of Contractor or Contractor's insurance carrier to provide such certificate of insurance. Contractor shall provide XTO notice and evidence of any modification to, or extension or cancellation of, Contractor's required insurance coverage.

XII.    Independent Contractor. Contractor will be an independent contractor with respect to the Work, and in all cases, Contractor shall be the employer or common law employer of all workers performing the Work. Neither Contractor nor any Subcontractor or any member of the Contractor Group, nor their respective workers, officers, employees or agents, will be deemed the agent, representative, employee, common law employee or servant of XTO. Subject to the provisions of Section 10.5.2, if applicable, Contractor, the Contractor Group and any of its or their Subcontractors will have complete and sole control over their respective workers and employees and the details of the Work performed and the methods by which the Work is accomplished, it being understood that XTO is interested only in the results of the Work. **Contractor specifically agrees that it shall ensure that no member or members of the Contractor Group are improperly classified as independent contractors or as the common law employees of the XTO Group, and shall defend, indemnify and hold harmless the XTO Group from and against any Indemnifiable Claims as a result of arising out of any failure by the Contractor Group to comply with this Section XII or Section IV above.** Notwithstanding the foregoing:

     (i)    XTO retains the right to (a) review a list, in advance of the commencement of the Work, of the names the Contractor Group workers who will be performing work on an XTO location, and (b) refuse entry to or request that the Contractor Group replace any unsatisfactory worker who is or may be performing work at an XTO location. XTO shall have the right to immediately remove from its location a worker of the Contractor Group whose behavior is unsafe or otherwise unacceptable, rude, harassing or threatening.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

(ii)    XTO shall not be precluded from asserting any borrowed employee or statutory employer defense or other defense that may exist.

(iii)    All materials, equipment and services shall meet the approval of XTO and shall be subject to a general right of inspection.

## XIII. Compliance with Laws and XTO Regulations and Policies.

13.1    **Safety.** Safe operations are of paramount importance to XTO. Accordingly, XTO has established a safety and environmental program for its own employees and requires that all members of the Contractor Group have an appropriate safety and environmental program. Contractor understands that the Work may involve danger and risk of injury, and the inherent danger is understood and assumed by Contractor. Contractor shall have sole responsibility for the safety of the Contractor Group employees, agents, and representatives, and acknowledges and agrees that XTO has no duty to supervise the work of, or to provide a safe place to work for, the employees, agents or representatives of the Contractor Group. Contractor shall adequately instruct all its employees and those of its Subcontractors or other members of the Contractor Group in the use of safety equipment and proper work procedures for the purpose of doing everything reasonably possible to protect against (i) personal injury or illness and (ii) damage to property or equipment. Contractor shall take all reasonable measures necessary to provide safe working conditions. Contractor shall furnish XTO promptly with a report of any and all accidents involving the Work (whether involving Contractor or the Contractor Group) and shall notify all government agencies of accidents as required by law. Contractor agrees to provide XTO with any reasonable information about any member of the Contractor Group that XTO requests for its internal use in evaluating the safety and environmental record of the Contractor Group.

13.2    **XTO Regulations and Policies.** Contractor will comply with and will cause the Contractor Group to comply with all applicable XTO rules and regulations (as revised from time to time) that relate to the safety and security of persons and property, protection of the environment, housekeeping and plant work hours, including, but not limited to, XTO's Drug, Alcohol, Firearms, Vehicle Search and Contraband Policy attached hereto as Attachment 1 and XTO's Safety, Health and Environmental Policy attached hereto as Attachment 2, both of which are incorporated by reference herein. Depending upon the scope and nature of the Work to be performed, XTO may require Contractor or the Contractor Group to execute other XTO safety policies or to complete policy questionnaires or surveys. XTO may revise, amend or alter its rules or policies or adopt new or additional rules or policies and they will become a part of this Agreement when Contractor receives a copy of them.

13.3    **Compliance with Laws.** Contractor will comply, and will cause the Contractor Group to comply, with all federal, state, tribal, and local laws, rules, regulations, ordinances, executive orders and other applicable requirements of all governmental agencies having jurisdiction over the Work which now or in the future may be (i) applicable to all Work performed hereunder or (ii) applicable to Contractor's or the Contractor Group's business, equipment, workers or employees engaged in or in any manner connected with its performance hereunder. All of the provisions of this Agreement shall be expressly subject to all applicable laws, orders, rules and regulations of any governmental body or agency having jurisdiction over the premises, and all Work contemplated hereunder shall be conducted in conformity therewith. Any provision of this Agreement which is inconsistent with any such laws, orders, rules or regulations shall be modified so as to conform therewith, and this Agreement, as so modified, shall continue in full force and effect. For the purpose of the preceding sentences, "laws, orders, rules, or regulations" includes, but is not limited to, the duly-enacted and effective regulations and ordinances

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

of any federally-recognized Indian or First Nations tribe. XTO and Contractor shall execute such documents, purchase orders and other instruments as may be reasonably required to conform with any applicable laws or orders. **Contractor shall protect, defend, indemnify and hold harmless the XTO Group from and against any and all liabilities or penalties incurred, fees or fines assessed, or damages suffered as a result of the failure of Contractor Group to comply with this Section and/or any applicable laws (including, but not limited to, the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act), rules, regulations, ordinances, executive orders and other applicable requirements.**

13.4    To the extent that Attachment 3, Equal Employment Opportunity Provision, Certification of Non-Segregated Facilities, and Employment of Qualified Disabled Individuals and Veterans, applies to this Agreement, Contractor will abide by Attachment 3, and will ensure that the Contractor Group abides by Attachment 3.

## XIV.   Miscellaneous.

14.1    <u>Attorneys' Fees</u>   If the Parties become involved in litigation, arbitration or mediation arising out of or related to this Agreement in which the services of an attorney or other expert are reasonably required, the prevailing Party will be fully compensated for the cost of its participation in such proceedings, including court costs, expenses and the reasonable costs incurred for attorneys' fees and experts' fees. Unless judgment goes by default, the attorneys' fee award will not be computed in accordance with any court schedule, but will be such as to fully reimburse all reasonable attorneys' fees actually incurred by the prevailing Party, regardless of the size of the judgment and regardless of whether the payment of all or a portion of such fees was contingent upon the outcome of the arbitration or litigation.

14.2    <u>Term</u>.  This Master Service Agreement will be for a term of 1 year from the date hereof and from year to year thereafter until terminated. Either Party may terminate this Master Service Agreement at any time, with or without cause; provided, however that Contractor will provide 30 days prior written notice of any such termination. Any termination will not affect any rights or obligations that have accrued under this Agreement.

14.3    <u>Force Majeure</u>.  A delay in or failure to perform by a Party, other than the payment of money, will not constitute a default that exposes it to liability for breach if and to the extent the delay or failure to perform is unforeseeable and is caused by an occurrence beyond the reasonable control of the Party, including, but not limited to an act of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or requirement of any governmental authority that was unforeseeable; act of war, rebellion, terrorism, piracy or sabotage or damage resulting therefrom; fire, flood, storm, hurricane, tornado, explosion or accident; riots or strikes or other concerted acts of workers, whether direct or indirect; inability after diligent effort to obtain necessary licenses or permits; or any other cause, whether or not of the same class or kind as those specifically above named, which is not within the control of the Party and which, by the exercise of reasonable diligence, the Party is unable to prevent or remedy.  If a condition of Force Majeure remains in effect for more than ten (10) days, XTO shall have the right to terminate the applicable Work Order without fee or penalty, and Contractor shall refund to XTO any prepaid amounts under such Work Order.

14.4    <u>Rebates</u>.  All Work is to be performed on an arm's-length basis. Neither Contractor nor the Contractor Group will pay any commissions, salary or fees or grant any rebates or other remuneration or gratuity to any employee of XTO, any relative of an employee of XTO, or any representative or agent of XTO, other than gifts of nominal value and entertainment, meals, and social invitations that are customary and proper under the circumstances which do not place the recipient under obligation.  The foregoing

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

prohibition will not apply to the payment of salaries to employees of Contractor or the Contractor Group who are related to XTO employees, if employment of the relative is not related to XTO's business relationship with Contractor. If any employee of XTO should solicit a gift or gratuity from Contractor or the Contractor Group, Contractor agrees to notify the Controller of XTO of such act. It is further understood that failure by Contractor to comply with this policy regarding rebates may, among other remedies, result in the termination of this Agreement by XTO and may preclude any future dealings between the parties.

14.5    Assignments and Subcontractors. Neither Party may assign this Agreement without the prior written consent of the other Party. Contractor may not subcontract its rights or duties under this Agreement, except to an Affiliate, without the prior written consent of XTO. Any assignment, delegation or subcontract in violation of this Section 14.5 will be void. Any consent given by XTO will not relieve Contractor of responsibility for performance of its obligations under this Agreement. Any assignee or Subcontractor of this Agreement shall expressly assume all obligations of Contractor hereunder, including, but not limited to, Contractor's indemnity obligations, upon acceptance of assignment of this Agreement, or subcontracting of the Work.

Contractor shall ensure that its contracts with its Subcontractors contain provisions which are in conformity with and no less stringent than the provisions of this Agreement and the applicable Work Order.

14.6    Waiver. The waiver by either Party of a breach or default by the other Party will not be deemed a waiver of any different or later breach.

14.7    Conflicts. For conflicts between or among provisions in the Master Service Agreement and any oral or written Work Order, this Master Service Agreement controls over any written or oral Work Order. It is expressly understood and agreed that no provision of any delivery ticket, invoice, confirmation of purchase order, published rate schedule or other instrument used or provided by Contractor will supersede the provision of this Master Service Agreement or any other agreement to any extent, for any purpose.

14.8    Applicable Law. This Agreement will be governed by the laws of the State of Texas, excluding the Texas rules on conflicts of law. For Work performed offshore, the provisions of this Agreement shall be construed in accordance with the General Maritime Law of the United States or, if not applicable, with the law of the state applicable to the Work.

14.9    Consequential Damages. In no event will either Party be liable to the other under this Agreement for indirect, special, incidental, punitive or consequential damages, including, but not limited to, loss of profits, loss of use of assets or loss of product or facilities downtime. This Section 14.9, however, shall in no way limit or modify a Party's indemnity obligations including consequential damages associated with such indemnify obligations under Article X above.

14.10   Captions. The captions used in this Agreement are for convenience only and will in no way define, limit or describe the scope or intent of this Agreement or any part thereof.

14.11   Notices. All notices and other communications required by this Agreement to be in writing will be deemed duly given to a Party two business days after such notice or other communication is sent to such Party by registered or certified mail, return receipt requested, postage prepaid, addressed to the individual and address indicated for such Party in a Work Order or such other person as a Party may designate from time to time as their representative. A Party may send a notice or other communication to the other Party using any other means of delivery, including personal delivery, facsimile, telex, ordinary

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

mail, or electronic mail, but no such notice or other communication will be deemed given unless and until it actually is received by such other Party. A Party may change the individual and/or address for notices by giving the other Party notice of such change in the manner set forth herein.

14.12   Entire Agreement. This Master Service Agreement, together with its Attachments and any written or oral Work Order between XTO and Contractor, as the case may be, are the entire agreement between the Parties on the subject matter referred to therein and supersede all prior negotiations, agreements, discussions and correspondence. This Master Service Agreement may not be changed orally, but may be changed only by an amendment, signed by both Parties, which specifies the change, addition or deletion. An amendment that is not in writing is void. This Master Service Agreement, when executed by Contractor, supersedes any previous contracts between Cross Timbers Operating Company, Cross Timbers Production Company, or XTO and Contractor identified as a Master Service Agreement or Master Field Service Agreement.

14.13   Severability. If any provision of this Master Service Agreement is held to be unenforceable, this Master Service Agreement will be deemed to be amended to the extent necessary to make it enforceable, or, if necessary, this Master Service Agreement will be deemed to be amended to delete the unenforceable provision or portion thereof. If any provision is deleted or amended, the remaining provisions will remain in full force and effect.

14.14   Use of Name and Marks. Contractor shall not use XTO's or Exxon Mobil Corporation's name, trade name, or trademarks, or those of any of XTO's Affiliates or other entity owned or controlled by Exxon Mobil Corporation, in any advertising or communication to the public, or make publicity releases or announcements concerning the Work Order, Services, or related activities, in any format without XTO's prior express written consent.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

IN WITNESS WHEREOF, the Parties have caused this Master Service Agreement to be executed by their duly authorized representatives as of the date first above written.

**XTO ENERGY INC.**

Representative: *Katie Baker* (ive Signature)
—B0C53B4750EB429...

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**M.E.C. Services**

Representative: *Mark Comer* ve Signature)
—80C94B69O22A486

Name: Mark Comer

Title: owner

Date: March 8, 2017

Federal Tax I.D. # 45-5254333

**BARNETT GATHERING, LLC**

Representative: *Katie Baker* ve Signature)
—B0C53B4750EB429...

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**TREND GATHERING & TREATING, LLC**

Representative: *Katie Baker* ve Signature)
—B0C53B4750EB429...

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**ENGLISH BAY PIPELINE, LLC**
**FAYETTEVILLE GATHERING COMPANY**
**MOUNTAIN GATHERING, LLC**
**NESSON GATHERING SYSTEM, LLC**
**RINGWOOD GATHERING COMPANY**
**TIMBERLAND GATHERING & PROCESSING COMPANY**

Representative: *Katie Baker* ve Signature)
—B0C53B4750EB429...

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

*MSA Attachment 1*

## XTO ENERGY INC.
## DRUG, ALCOHOL, FIREARM, VEHICLE SEARCH AND CONTRABAND POLICY

XTO PROHIBITS THE USE, MANUFACTURE, SALE, TRANSFER, OR POSSESSION OF ALCOHOLIC BEVERAGES, ILLEGAL AND NON-PRESCRIBED DRUGS, DRUG PARAPHERNALIA, EXPLOSIVES, FIREARMS AND OTHER WEAPONS ON ANY XTO PREMISES OR ANY WORK SITE WHERE XTO'S EMPLOYEES, CONTRACTORS, VENDORS OR SUBCONTRACTORS ARE ENGAGED.

IF PRESCRIPTION MEDICATION MUST BE BROUGHT TO ANY SUCH WORK LOCATION, THE MEDICATION MUST BE KEPT IN ITS PRESCRIPTION CONTAINER UNTIL USED. ANY USE OF A PRESCRIBED MEDICATION MUST BE IN STRICT ACCORDANCE WITH THE PRESCRIPTION. NO ONE MAY WORK ON AN XTO WORK LOCATION IF HE/SHE IS TAKING MEDICATION THAT INTERFERES WITH HIS/HER ABILITY TO PERFORM HIS/HER JOB SAFELY. THE USE OF ANY MEDICATION THAT MIGHT INTERFERE WITH AN INDIVIDUAL'S ABILITY TO PERFORM HIS/HER JOB SAFELY MUST BE REPORTED TO THE SENIOR XTO OFFICIAL ON SITE, OR, IF NO XTO OFFICIAL IS ON SITE, TO XTO'S ENVIRONMENTAL, HEALTH AND SAFETY DEPARTMENT.

ANY PERSON WHO IS FOUND DEPARTING XTO'S WORK LOCATION IN POSSESSION OF XTO OR A LANDOWNER'S PROPERTY THAT IS NOT AUTHORIZED IN WRITING FOR REMOVAL FROM XTO'S WORK LOCATION IS SUBJECT TO DISCIPLINARY ACTION, INCLUDING IMMEDIATE DISCHARGE, OR REMOVAL AND FUTURE PROHIBITION FROM THE PREMISES.

ENTRY INTO OR PRESENCE ON XTO'S JOB SITE BY ANY PERSON IS CONDITIONED UPON XTO'S RIGHT TO SEARCH THE PERSON AND PROPERTY OF ANY PERSON, AT ANY TIME, AND WITHOUT NOTICE. ANY PERSON, HIS/HER VEHICLE, OR PERSONAL PROPERTY IS SUBJECT TO SEARCH.   PROPERTY MAY INCLUDE, BUT IS NOT LIMITED TO, THE FOLLOWING: WALLETS, PURSES, LOCKERS, BAGGAGE, OFFICES, DESKS, TOOL BOXES, CLOTHING, AND VEHICLES.   ANY ILLEGAL CONTRABAND OR UNAUTHORIZED PROPERTY FOUND MAY BE TURNED OVER TO THE APPROPRIATE AUTHORITIES.

XTO RESERVES THE RIGHT TO REQUIRE ANY PERSON ON AN XTO LOCATION TO SUBMIT TO A DRUG TEST OR TO REQUIRE ANY CONTRACTOR, VENDOR, OR SUB-CONTRACTOR TO TEST ITS EMPLOYEES. REFUSAL TO SUBMIT TO OR FAILING A DRUG TEST WILL RESULT IN THE IMMEDIATE REMOVAL FROM THE LOCATION.

CONTRACTORS, VENDORS, OR SUB-CONTRACTORS VIOLATING THIS POLICY MAY BE SUBJECT TO AN IMMEDIATE CANCELLATION OF THEIR CONTRACT.

IN THE EVENT CONTRACTOR, VENDOR, OR SUB-CONTRACTOR ARE PERFORMING WORK SUBJECT TO DEPARTMENT OF TRANSPORTATION (DOT) REGULATIONS, SUCH PARTIES WILL SUBMIT A COPY OF THEIR ALCOHOL AND DRUG TESTING PROGRAMS FOR REVIEW BY XTO. XTO MAY USE A THIRD PARTY TO REVIEW THE PROGRAMS, AND IN THE EVENT THE PROGRAMS ARE NOT SUFFICIENT BY DOT STANDARDS, THE COST OF ANY SUBSEQUENT REVIEW FOR COMPLIANCE SHALL BE PAID BY SUCH PARTIES.

SHOULD YOU HAVE ANY QUESTIONS REGARDING THIS POLICY, PLEASE SEE YOUR XTO CONTRACT REPRESENTATIVE.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

*MSA Attachment 2*

### XTO ENERGY INC. SAFETY, HEALTH AND ENVIRONMENTAL POLICY

XTO is committed to protecting the environment and the health and safety of employees, contractors, local communities, and others who may be impacted by its business activities. XTO requires its contractors to actively participate, and to cause its affiliates, subcontractors, and other members of the Contractor Group to actively participate, in the establishment of a safe working environment as follows:

### CONTRACTOR AND THE CONTRACTOR GROUP'S RESPONSIBILITIES

- ♦ Perform all work in a safe, environmentally sensitive, and workmanlike manner and provide necessary safety precautions and equipment for their employees, contractors, consultants, and other personnel.

- ♦ Report all injuries and incidents (including property damage) immediately (including a written report within 72 hours of the accident) to the XTO supervisor or designated alternate.

- ♦ Report all spills and releases immediately (including a written report within 72 hours of the incident) to the XTO supervisor or designated alternate and communicate to XTO any other environmental risks or exposures.

- ♦ Instruct its employees in the applicable XTO standards and practices.

- ♦ Conduct its operations in a manner that protects human health and safety, minimize adverse environmental impacts, and mitigates unavoidable impacts on the environment.

- ♦ Comply with all applicable safety, health, and environmental laws and regulations, and apply responsible standards where law or regulations do not exist.

- ♦ Have in place an active injury and loss prevention program and advise and train line managers in safety, health, and environmental requirements.

- ♦ Provide its employees with adequate training in safety, health, and environmental matters, and hold each employee accountable for compliance with this policy.

- ♦ Provide technical and legal support to those line managers responsible for compliance with this policy.

- ♦ Require timely communication between employees and their supervisors regarding safety, health, and environmental issues.

- ♦ Require employees to communicate their concerns to management about any unresolved safety, health, and environmental risks they might have identified in the Contractor's operations.

- ♦ Monitor, evaluate and report performance in safety, health, and environmental protection.

- ♦ Provide a copy of this policy to the Contractor's contractors and notify them that they and their subcontractors will be expected to perform all work for the Contractor in compliance with this policy.

- ♦ Emphasize the importance of maintaining safety and environmental standards in economically-competitive situations.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

## CONTRACTOR AND THE CONTRACTOR GROUP'S PERSONNEL (EMPLOYEE/ SUBCONTRACTOR / CONTRACTOR / CONSULTANT) RESPONSIBILITIES:

Each employee shall demonstrate a positive attitude toward injury-prevention and environmental protection and company property. Each employee is responsible for:

- Performing their job safely, for their personal safety, the safety of fellow workers, and the protection of the environment and company property. This includes the proper use of safety equipment and strict adherence to safe work practices.

- Understanding all safety and environmental policies pertinent to their job responsibilities.

- Performing safety and environmental assessments.

- Actively participating in safety and environmental meetings.

- Reporting promptly all unsafe conditions and practices (including those of contractors), to their supervisor.

- Reporting every spill/release to their supervisor.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

### EQUAL EMPLOYMENT OPPORTUNITY PROVISION, CERTIFICATION OF NONSEGREGATED FACILITIES, AND EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS

The term "Contractor" as used herein shall mean the party designated as Contractor, of which this Attachment is a part. The term "Agreement," as used herein shall mean the foregoing agreement to which this Attachment is a part. This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Work, including but not limited to Executive Order 11246.

1.   **EQUAL EMPLOYMENT OPPORTUNITY PROVISION.**

If the value of this Agreement exceeds $10,000, then during the performance of this Agreement, Contractor agrees as follows:

A.   The contract clause prescribed in Section 202 of Executive Order No. 11246 of September 24, 1965 (41 CFR 60-1), is incorporated by reference into this Attachment.

B.   Contractor further agrees and certifies that, if the value of this Agreement is $50,000 or more and Contractor has 50 or more employees, and is not otherwise exempt, Contractor will:

(1) Develop a written affirmative action compliance program for each of his establishments in accordance with the requirements of 41 CFR 60-1.40 and 60-2. This program shall be developed within 120 days of the commencement of a covered contract, and shall be maintained as long as required by law or regulation.

(2) File annually, complete and accurate reports on Standard Form 100, Equal Employment Opportunity information Report EEO-1, in accordance with the requirements of 41 CFR 60-1.7, and otherwise comply with and file such other compliance reports as may be required under Executive Order 11246, as amended, and Rules and Regulations adopted thereunder.

2.   **CERTIFICATION OF NONSEGREGATED FACILITIES.**

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this Agreement. The term "segregated facilities" means any waiting room, work areas, restrooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion or national origin, because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for the specific time period) it will obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for the specific time period).

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

"NOTICE TO PROSPECTIVE VENDORS AND SUBCONTRACTORS
REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities, as required by 41 CFR 60-1.8, must be submitted prior to the award of any contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause (41 CFR 60-1.4). The Certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually or annually). (NOTE: The penalty for making false statements is prescribed in 18 (U.S.C. 1001)."

3.   **EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS.**

Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-471 (Section 503 of the Rehabilitation Act of 1973, as amended), any Contractor with a contract over $10,000 in value must establish an affirmative action program to employ and advance in employment qualified disabled individuals.

Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran, veteran of the Vietnam era, recently separated veteran, or other protected veteran in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-250 (Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, as amended), each Contractor with a contract over $100,000 must take affirmative action to employ and advance in employment qualified special disabled veterans, recently separated veterans, veterans of the Vietnam Era, veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized, veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded pursuant to Executive Order No. 12985; or other protected veterans, and list with appropriate local employment service offices all suitable employment openings.

The additional contract clauses prescribed in 41 CFR 60-741.4 and 60-250.4 are incorporated by reference into this Attachment.

DocuSign
SECURED

## Certificate Of Completion

Envelope Id: B711EF46D3A04F0280EC3791E11361AA

Subject: XTO Energy Master Service Agreement with MEC Services, LLC

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 21 | Signatures: 5 | Envelope Originator: |
| Supplemental Document Pages: 0 | Initials: 0 | Sue King |
| Certificate Pages: 3 | | |
| AutoNav: Enabled | Payments: 0 | sue_king@xtoenergy.com |
| EnvelopeId Stamping: Enabled | | IP Address: 158.26.65.165 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sue King | Location: DocuSign |
|     3/6/2017 9:45:46 AM |     sue_king@xtoenergy.com | |
| Security Appliance Status: Connected | Pool: XTO | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mark Corner<br>markecomer@gmail.com<br>owner<br>M.E.C. Services<br>Security Level: Email, Account Authentication (None) | *Mark Comer*<br>Using IP Address: 199.195.169.45 | Sent: 3/6/2017 9:46:44 AM<br>Viewed: 3/7/2017 2:30:34 PM<br>Signed: 3/8/2017 9:55:07 AM |
| Electronic Record and Signature Disclosure:<br>  Accepted: 3/7/2017 2:30:34 PM<br>  ID: e0c22166-5acc-45a5-8b48-3963115ad852<br>  Company Name: ExxonMobil Production 10 | | |
| Katie Baker<br>katie_baker@xtoenergy.com<br>Supervisor, Master Contracts<br>XTO<br>Security Level: Email, Account Authentication (None) | *Katie Baker*<br>Using IP Address: 158.26.2.165 | Sent: 3/8/2017 9:56:08 AM<br>Viewed: 3/8/2017 10:16:03 AM<br>Signed: 3/8/2017 10:16:38 AM |
| Electronic Record and Signature Disclosure:<br>  Accepted: 3/8/2017 10:16:03 AM<br>  ID: 36a5348d-2932-4d4f-865e-fe3d8645ebcf<br>  Company Name: ExxonMobil Production 10 | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

## Notary Events

| Notary Events | | Timestamp |
|---|---|---|

## Envelope Summary Events

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/8/2017 9:56:08 AM |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Certified Delivered | Security Checked | 3/8/2017 10:16:04 AM |
| Signing Complete | Security Checked | 3/8/2017 10:16:38 AM |
| Completed | Security Checked | 3/8/2017 10:16:38 AM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 12/30/2016 6:30:07 AM
Parties agreed to: Mark Comer, Katie Baker

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

Exxon Mobil Corporation (ExxonMobil) [1] uses the DocuSign service to collect signatures, endorsements, and approvals for corporate purposes. DocuSign may be used by ExxonMobil to conduct corporate business endorsements and approvals or to gather electronic signatures from 3rd parties for business purposes. Please read the information below and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button.

**Acknowledging your access and consent to receive materials electronically**

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference.
- I am authorized to do the specific type of work (approve, endorse, etc.) in the country where I am physically located when using DocuSign

**Getting paper copies**

You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing the document.

**How to contact Exxon Mobil Corporation:**

For email address changes or if you have questions about a document you receive please contact the sending ExxonMobil Business organization.

[1] ExxonMobil and/or ExxonMobil Affiliates mean (a) Exxon Mobil Corporation or any parent of Exxon Mobil Corporation, (b) any company or partnership in which Exxon Mobil Corporation or any parent of Exxon Mobil Corporation now or hereafter, directly or indirectly (1) owns or (2) controls, more than fifty per cent (50%) of the ownership interest having the right to vote or appoint its directors or functional equivalents ("Affiliated Company") and (c) any joint venture in which Exxon Mobil Corporations, any parent of Exxon Mobil Corporation or an Affiliated Company has day to day operational control.

2019-67421 / Court: 129

# Exhibit B

8/22/2019 4:35 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 36202476
By: Nelson Cuero
Filed: 8/22/2019 4:35 PM

# 2019-58891 / Court: 165

CAUSE NO. _____

| | | |
|---|---|---|
| FRANCISCO MALDONADO, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | _____ JUDICIAL DISTRICT |
| | § | |
| XTO ENERGY, INC. and MEC | § | |
| SERVICES, LLC, | § | |
| | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND REQUEST FOR DISCLOSURES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Francisco Maldonado ("Plaintiff") and files this Original Petition, Jury Demand, and Request for Disclosure against Defendants XTO Energy, Inc. and MEC Services, LLC (collectively "Defendants") and alleges as follows:

Plaintiff Maldonado contracted coccidioidomycosis, a disease also known as "Valley Fever," while performing work for Defendants in Texas and New Mexico. Coccidioidomycosis is an infection caused by the fungus Coccidioides. As a result of Plaintiff's particularly severe infection, Plaintiff Maldonado has lost his right eye and appears to have aged several years over an incredibly short time-period due to the severity of his infection. The progression of Plaintiff Maldonado's disease is virtually impossible to describe in words. For this reason, these images are included for illustration:

---

Francisco Maldonado while working prior to the infection:



Francisco Maldonado during the progression of the infection:



Francisco Maldonado today:



Francisco Maldonado developed a particularly serve form of the disease through his excavation work. As a result of the foreseeable, preventable infection he contracted during his excavation work for Defendants, he is permanently disfigured due to the loss of his eye and some of the bones around his mouth. Plaintiff spent months in the hospital, and will require additional medical attention related to the infection for the remainder of his life.

This horrific tragedy was entirely preventable. Defendants knew and should have known of the risks of contracting Valley Fever, which is known in some instances can be so severe as to cause permanent impairment, and even death. Defendants nevertheless intentionally and with reckless disregard failed to take adequate precautions or provide sufficient warnings, appropriate training, and failed to provide proper protective gear to Plaintiff, which would have prevented his permanent disfigurement and impairment.

## I.
## DISCOVERY CONTROL PLAN

1.      Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4.

## II.
## AMOUNT IN CONTROVERSY

2.      As required by Texas Rule of Civil Procedure 47, Plaintiff states that he is seeking monetary relief of over $1,000,000.00.

---

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND**                                    **PAGE 3**
**AND REQUEST FOR DISCLOSURES**

## III.
## PARTIES

3.    Plaintiff Francisco Maldonado is an individual residing in Clint, Texas. The last three digits of Mr. Maldonado's social security number are 740, and the last three digits of his driver's license number are 777.

4.    Defendant XTO Energy, Inc. is a Delaware corporation authorized to do business in the State of Texas and whose principal place of business is in Spring, Texas. Defendant XTO Energy, Inc. may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7ⁱ Street, Suite 620, Austin, TX 78701, or wherever it may be found.

5.    Defendant MEC Services, LLC is a foreign limited liability company doing business in the State of Texas and does not have a designated agent of service in Texas. Defendant MEC Services, LLC may be served with process through the Texas Secretary of State through its registered agent, Mark Comer, 3791 Southern Blvd., Suite 260, Rio Rancho, New Mexico 87124.

## IV.

## JURISDICTION AND VENUE

6.    Venue is proper in Harris County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002 because Harris County is where Defendant XTO Energy, Inc. maintains its principal office.

---

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND**                                      **PAGE 4**
**AND REQUEST FOR DISCLOSURES**

7.    The Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of Harris County District Courts.

8.    The Court has personal jurisdiction over Defendant XTO Energy, Inc. because it is a resident of Texas and it committed torts, which are the subject of this suit, in whole or in part in Texas.

9.    The Court has personal jurisdiction over Defendant MEC Services, LLC because MEC Services, LLC purposely availed itself of the privileges and benefits of conducting business in Texas and it committed torts, which are the subject of this suit, in whole or in part in Texas.

## V.
## STATEMENT OF FACTS

10.    To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

11.    From approximately August 2018 to January 2019, Plaintiff Francisco Maldonado was doing construction and excavation work for Defendants in Texas and New Mexico.

12.    While performing work for Defendants, Plaintiff was exposed to the soil organism Coccidioides and contracted Valley Fever.

13.    The area where Plaintiff was working is endemic for Valley Fever.

14.     Defendants knew of the risks of contracting Valley Fever and knew that Coccidioides fungus was found or could reasonably be expected to be found in the area Plaintiff was working and was exposed to Coccidioides fungus.

15.     Defendants failed to provide Plaintiff with the proper protective equipment to protect Plaintiff from Coccidioides.

16.     Defendants failed to use best practices to protect Plaintiff from Coccidioides in an area Defendants knew Coccidioides were endemic.

17.     Defendants failed to provide proper safety training or warnings about the risks of exposure to Coccidioides fungus, and to disclose the possibility of contracting a severe case of coccidioidomycosis.

18.     Defendant XTO required MEC Services to comply with its safety regulations, and those safety regulations increased the probability of Plaintiff's harm, and Defendant XTO failed to appropriately investigate, screen, or supervise MEC to ensure that Plaintiff's harm would not occur.

19.     As a result, Plaintiff has suffered and will continue to suffer serious and debilitating injuries and damages.

20.     Plaintiff has endured months in a hospital and has undergone multiple surgeries due to the infection which caused the removal of his right eye and portions of his jaw.

---

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND**                                           **PAGE 6**
**AND REQUEST FOR DISCLOSURES**

21.    Plaintiff Francisco Maldonado must now be fed through a tube. His medical care as a result of his infection is anticipated to continue for the remainder of his lifetime.

## VI.
## CAUSES OF ACTION

### A.    Negligence

22.    To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

23.    Defendants had a duty to exercise ordinary care, that is, to do what a person of ordinary prudence would have done under the same or similar circumstances.

24.    Defendants breached this duty, by, among other things, engaging in the following intentional acts and omissions, without just cause or excuse, that were reasonably expected to result in the injuries suffered by Plaintiff:

        a.    Failing to provide proper safety equipment;

        b.    Failing to warn about the dangers of Coccidioides;

        c.    Failing to properly investigate, screen, or supervise
              subcontractors;

        d.    Failing to provide proper safety training;

        e.    Failing to implement appropriate control measures; and

        f.    Failing to have proper policies and procedures in place
              regarding safety, including policies and procedures related
              to Coccidioides and/or Valley Fever.

---

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND**                                    **PAGE 7**
**AND REQUEST FOR DISCLOSURES**

25.    Defendants expected the foregoing acts and omissions to result in the injuries suffered by Plaintiff and/or utterly disregarded the consequences.

Unofficial Copy Office of Marilyn Burgess District Clerk

26.    Defendants are jointly and severally responsible for the acts and/or omissions of its respective agents, employees, servants, ostensible agents, and/or representatives through the theories of employment, agency, *respondeat superior*, ostensible agency, apparent agency, actual agency, and/or other agency and/or vicarious responsibility principles.

27.    Defendants' acts and omissions described herein proximately caused Plaintiff to suffer serious injury and damages, including but not limited to past and future pain and suffering; past and future mental anguish; past and future medical, pharmaceutical, life care, therapy, and treatment expenses; past and future lost earning capacity; past and future lost income; past and future loss of enjoyment of life; past and future disfigurement; and past and future physical impairment. In addition to each of these damages, Plaintiff also seeks prejudgment and post-judgment interest as well as all compensable court costs.

## VII.
## DAMAGES

28.    To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

29.    As a consequence of Defendants' wrongful conduct described herein, Plaintiff has suffered actual, compensatory, consequential, and special damages, including but not limited to the following:  past and future pain and

suffering; past and future mental anguish; past and future medical, pharmaceutical, life care, therapy, and treatment expenses; past and future lost earning capacity; past and future lost income; past and future loss of enjoyment of life; past and future disfigurement; and past and future physical impairment. Plaintiff seeks damages in an amount within the jurisdictional limits of this Court.

## VIII.
## JURY DEMAND

30.     Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## IX.
## CONDITIONS PRECEDENT

31.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## X.
## REQUEST FOR DISCLOSURE

32.     Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

# XI.
## PRAYER

33.    For these reasons, Plaintiff asks that the court issue citation for Defendants to appear and answer, and that Plaintiff be awarded a judgment against Defendants for the following:

1)    Past and future pain and suffering;

2)    Past and future mental anguish;

3)    Past and future medical, pharmaceutical, life care, therapy, and treatment expenses;

4)    Past and future lost earning capacity;

5)    Past and future lost income;

6)    Past and future loss of enjoyment of life;

7)    Past and future disfigurement;

8)    Past and future physical impairment;

9)     All other economic damages allowed by law;

10)   Exemplary damages;

11)   Prejudgment and post-judgment interest at the maximum rate allowable by law;

12)   Costs of Court; and

13)   All other relief to which Plaintiff may be justly entitled, at law or in equity.

DATED the 22nd day of August, 2019.

Respectfully submitted,

*/s/ Christopher S. Hamilton*
Christopher S. Hamilton
State Bar No. 24046013
chamilton@hamiltonwingo.com
Stephen T. Blackburn
State Bar No. 24043555
sblackburn@hamiltonwingo.com
Ray T. Khirallah, Jr.
State Bar No. 24060091
rkhirallah@hamiltonwingo.com
Andrea L. Fitzgerald
State Bar No. 24081982
afitzgerald@hamiltonwingo.com

HAMILTON | WINGO LLP
325 N. St. Paul Street, Suite 3300
Dallas, Texas 75201
Telephone:  (214) 234-7900
Facsimile:  (214) 234-7300

**ATTORNEYS FOR PLAINTIFF**

2019-67421 / Court: 129

# Exhibit C

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
N1.4B.271
Spring, Texas 77389
832 624 1523 Telephone
261 353 2164 Facsimile
shannan.e.goss@exxonmobil.com

**Shannan E. Goss**
Counsel - Litigation

ExxonMobil

September 13, 2019

*Via Email:*   markcomer@mecfieldservices.com
*and*          markcomer@gmail.com
*Via UPS* Overnight Delivery
Mark Comer
M.E.C. Services
522 W. Mermod Street #721
Carlsbad, New Mexico 88220

Dear Mr. Comer:

**Re: Cause No. 2019-58891;** *Francisco Maldonado v. XTO Energy, Inc. and MEC Services,*
*LLC,* **in the 165th Judicial District Court, Harris County, Texas**

Dear Mr. Comer:

On August 26, 2019, XTO Energy Inc., an ExxonMobil subsidiary, ("XTO") received a Petition
filed by Mr. Francisco Maldonado ("Mr. Maldonado") in the 165th Judicial District Court, in Harris
County, Texas (the "Matter"). We understand that Mr. Maldonado is alleging he contracted
coccidioidomycosis, or "Valley Fever," while performing excavation work in Texas and New
Mexico for MEC Services, LLC ("MEC") and XTO. A copy of the Petition is enclosed for your ease
of reference (Attachment 1).

This Matter is subject to MEC's indemnification obligations as a Contractor under the Master
Service Agreement, which was executed by the parties effective on March 8, 2017 (the "MSA" or
"Agreement"). A copy of the MSA is also enclosed for your ease of reference (Attachment 2).
Under the Agreement, MEC agreed to:

> release, *defend, indemnify and hold the XTO Group harmless from and*
> *against any and all claims,* demands, and causes of action of every kind and
> character (including without limitation, fines, penalties, remedial obligations, court
> costs and reasonable attorneys' fees, including attorneys' fees incurred in the
> enforcement of this indemnity) (collectively, the "Indemnifiable Claims") *arising*
> *out of, without limitation, any physical or mental injury,* illness and/or death of
> any one or more members of the Contractor Group, . . . *in any manner incident*
> *to, connected with or arising out of the performance of the Work.* MSA,
> Section 10.1.1.

Mr. Mark Comer
September 13, 2019
Page 2

The XTO Group is specifically defined to include XTO Energy Inc. as a party entitled to protection under this Agreement. *See* MSA, Section 2.8. Accordingly, XTO hereby requests that MEC assume the defense of XTO and agree to indemnify XTO for any liability that may result from the Matter.

Upon receipt of this letter, please notify me in writing, as to whether MEC will assume and conduct the defense of this Matter and indemnify XTO for any liability that may result. Additionally, the MSA required the XTO Group to be named as an additional insured under MEC's general liability insurance and/or umbrella excess liability insurance policies. *See* MSA, Section 10.1.3. XTO therefore requests that you put your insurance carrier on notice of the Matter as soon as possible, if you have not done so already.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Shannan E. Goss

Enclosures

Cc:  Arthur J. Gallagher & Co. Via Email debbie_aranda@ajg.com and UPS Overnight Delivery
     Attn: Debbie Aranda
     Six Desta Dr., Ste. 5900
     Midland, Texas 79705
     w/enclosures



## Notice of Service of Process

null / ALL
Transmittal Number: 20297109
Date Processed: 06/26/2019

| | |
|---|---|
| Primary Contact: | Matthew T. Shanley - N1.4B.301<br>Exxon Mobil Corporation<br>22777 Springwoods Village Pkwy<br>Spring, TX 77389-1425 |
| Electronic copy provided to: | Karen Cunningham N1.4B.293 |

| | |
|---|---|
| Entity: | XTO Energy Inc.<br>Entity ID Number 1737644 |
| Entity Served: | XTO Energy Inc . |
| Title of Action: | Francisco Maldonado vs. XTO Energy, Inc. |
| Document(s) Type: | Citation/Petition |
| Nature of Action: | Personal Injury |
| Court/Agency: | Harris County District Court, TX |
| Case/Reference No: | 201958891 |
| Jurisdiction Served: | Texas |
| Date Served on CSC: | 06/26/2019 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Christopher S. Hamilton<br>214-234-7900 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

To avoid potential delay, please do not send your response to CSC
251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

Attachment 1

COPY OF PLEADING PROVIDED BY PLT

CAUSE NO. 201958891

RECEIPT NO: 825890  TRACKING NO: 73661599

| | |
|---|---|
| Plaintiff: | In The 165th |
| MALDONADO, FRANCISCO | Judicial District Court of |
| vs. | Harris County, Texas |
| Defendant: | 201 CAROLINE |
| XTO ENERGY INC | Houston, Texas |

CITATION CORPORATE

THE STATE OF TEXAS
County of Harris

To:    XTO ENERGY INC (A DELAWARE CORPORATION) BY SERVING ITS REGISTERED AGENT
CORPORATION SERVICE COMPANY D/B/A CSC-LAWYERS INCORPORATING SERVICE COMPANY OR
WHEREVER IT MAY BE FOUND
211 E 7TH STREET SUITE 620, AUSTIN TX 78701

Attached is a copy of: PLAINTIFF'S ORIGINAL PETITION JURY DEMAND AND REQUEST FOR
DISCLOSURES

This instrument was filed on August 22, 2019 in the above cited cause number and court. The instrument attached describes
the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your Attorney do not file a written answer with
the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after
you were served this citation and petition, a default judgment may be taken against you.

This citation was issued on August 23, 2019, under my hand and seal of said court.

Issued at the request of:

Hamilton, Christopher J.
325 N. St. Paul Street, Suite 3300
Dallas, TX 75201
214-234-7900
Bar Number: 24046013

Marilyn Burgess

Marilyn Burgess, District Clerk

Harris County, Texas
201 CAROLINE  Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

Generated By: NELSON CUERO

*Came to hand  8/23/2019 @ 10:55 Am. WN Finch*

*Executed  this  8/26/  2019.*

8/22/2019 4:35 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 35202475
By: Nelson Cuero
Filed: 8/22/2019 4:35 PM

CAUSE NO. _____

| | | |
|---|---|---|
| FRANCISCO MALDONADO, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | _____ JUDICIAL DISTRICT |
| | § | |
| XTO ENERGY, INC. and MEC | § | |
| SERVICES, LLC, | § | |
| | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND REQUEST FOR DISCLOSURES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Francisco Maldonado ("Plaintiff") and files this Original Petition, Jury Demand, and Request for Disclosure against Defendants XTO Energy, Inc. and MEC Services, LLC (collectively "Defendants") and alleges as follows:

Plaintiff Maldonado contracted coccidioidomycosis, a disease also known as "Valley Fever," while performing work for Defendants in Texas and New Mexico. Coccidioidomycosis is an infection caused by the fungus Coccidioides. As a result of Plaintiff's particularly severe infection, Plaintiff Maldonado has lost his right eye and appears to have aged several years over an incredibly short time-period due to the severity of his infection. The progression of Plaintiff Maldonado's disease is virtually impossible to describe in words. For this reason, these images are included for illustration:

Francisco Maldonado while working prior to the infection:



Francisco Maldonado during the progression of the infection:



Francisco Maldonado today:



Francisco Maldonado developed a particularly serve form of the disease through his excavation work. As a result of the foreseeable, preventable infection he contracted during his excavation work for Defendants, he is permanently disfigured due to the loss of his eye and some of the bones around his mouth. Plaintiff spent months in the hospital, and will require additional medical attention related to the infection for the remainder of his life.

This horrific tragedy was entirely preventable. Defendants knew and should have known of the risks of contracting Valley Fever, which is known in some instances can be so severe as to cause permanent impairment, and even death. Defendants nevertheless intentionally and with reckless disregard failed to take adequate precautions or provide sufficient warnings, appropriate training, and failed to provide proper protective gear to Plaintiff, which would have prevented his permanent disfigurement and impairment.

## I.
## DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4.

## II.
## AMOUNT IN CONTROVERSY

2.    As required by Texas Rule of Civil Procedure 47, Plaintiff states that he is seeking monetary relief of over $1,000,000.00.

## III.
## PARTIES

3.     Plaintiff Francisco Maldonado is an individual residing in Clint, Texas. The last three digits of Mr. Maldonado's social security number are 740, and the last three digits of his driver's license number are 777.

4.     Defendant XTO Energy, Inc. is a Delaware corporation authorized to do business in the State of Texas and whose principal place of business is in Spring, Texas. Defendant XTO Energy, Inc. may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

5.     Defendant MEC Services, LLC is a foreign limited liability company doing business in the State of Texas and does not have a designated agent of service in Texas. Defendant MEC Services, LLC may be served with process through the Texas Secretary of State through its registered agent, Mark Comer, 3791 Southern Blvd., Suite 260, Rio Rancho, New Mexico 87124.

## IV.
## JURISDICTION AND VENUE

6.     Venue is proper in Harris County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002 because Harris County is where Defendant XTO Energy, Inc. maintains its principal office.

7.    The Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of Harris County District Courts.

8.    The Court has personal jurisdiction over Defendant XTO Energy, Inc. because it is a resident of Texas and it committed torts, which are the subject of this suit, in whole or in part in Texas.

9.    The Court has personal jurisdiction over Defendant MEC Services, LLC because MEC Services, LLC purposely availed itself of the privileges and benefits of conducting business in Texas and it committed torts, which are the subject of this suit, in whole or in part in Texas.

## V.
## STATEMENT OF FACTS

10.    To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

11.    From approximately August 2018 to January 2019, Plaintiff Francisco Maldonado was doing construction and excavation work for Defendants in Texas and New Mexico.

12.    While performing work for Defendants, Plaintiff was exposed to the soil organism Coccidioides and contracted Valley Fever.

13.    The area where Plaintiff was working is endemic for Valley Fever.

14.     Defendants knew of the risks of contracting Valley Fever and knew that Coccidioides fungus was found or could reasonably be expected to be found in the area Plaintiff was working and was exposed to Coccidioides fungus.

15.     Defendants failed to provide Plaintiff with the proper protective equipment to protect Plaintiff from Coccidioides.

16.     Defendants failed to use best practices to protect Plaintiff from Coccidioides in an area Defendants knew Coccidioides were endemic.

17.     Defendants failed to provide proper safety training or warnings about the risks of exposure to Coccidioides fungus, and to disclose the possibility of contracting a severe case of coccidioidomycosis.

18.     Defendant XTO required MEC Services to comply with its safety regulations, and those safety regulations increased the probability of Plaintiff's harm, and Defendant XTO failed to appropriately investigate, screen, or supervise MEC to ensure that Plaintiff's harm would not occur.

19.     As a result, Plaintiff has suffered and will continue to suffer serious and debilitating injuries and damages.

20.     Plaintiff has endured months in a hospital and has undergone multiple surgeries due to the infection which caused the removal of his right eye and portions of his jaw.

21. Plaintiff Francisco Maldonado must now be fed through a tube. His medical care as a result of his infection is anticipated to continue for the remainder of his lifetime.

## VI.
## CAUSES OF ACTION

### A. Negligence

22. To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

23. Defendants had a duty to exercise ordinary care, that is, to do what a person of ordinary prudence would have done under the same or similar circumstances.

24. Defendants breached this duty, by, among other things, engaging in the following intentional acts and omissions, without just cause or excuse, that were reasonably expected to result in the injuries suffered by Plaintiff:

      a.    Failing to provide proper safety equipment;

      b.    Failing to warn about the dangers of Coccidioides;

      c.    Failing to properly investigate, screen, or supervise subcontractors;

      d.    Failing to provide proper safety training;

      e.    Failing to implement appropriate control measures; and

      f.    Failing to have proper policies and procedures in place regarding safety, including policies and procedures related to Coccidioides and/or Valley Fever.

25.    Defendants expected the foregoing acts and omissions to result in the injuries suffered by Plaintiff and/or utterly disregarded the consequences.

26.    Defendants are jointly and severally responsible for the acts and/or omissions of its respective agents, employees, servants, ostensible agents, and/or representatives through the theories of employment, agency, *respondeat superior*, ostensible agency, apparent agency, actual agency, and/or other agency and/or vicarious responsibility principles.

27.    Defendants' acts and omissions described herein proximately caused Plaintiff to suffer serious injury and damages, including but not limited to past and future pain and suffering; past and future mental anguish; past and future medical, pharmaceutical, life care, therapy, and treatment expenses; past and future lost earning capacity; past and future lost income; past and future loss of enjoyment of life; past and future disfigurement; and past and future physical impairment. In addition to each of these damages, Plaintiff also seeks prejudgment and post-judgment interest as well as all compensable court costs.

## VII.
## DAMAGES

28.    To the extent not inconsistent herewith, Plaintiff incorporates by reference all of the above facts and paragraphs as if set forth fully herein.

29.    As a consequence of Defendants' wrongful conduct described herein, Plaintiff has suffered actual, compensatory, consequential, and special damages, including but not limited to the following:  past and future pain and

suffering; past and future mental anguish; past and future medical, pharmaceutical, life care, therapy, and treatment expenses; past and future lost earning capacity; past and future lost income; past and future loss of enjoyment of life; past and future disfigurement; and past and future physical impairment. Plaintiff seeks damages in an amount within the jurisdictional limits of this Court.

## VIII.
## JURY DEMAND

30. Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## IX.
## CONDITIONS PRECEDENT

31. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## X.
## REQUEST FOR DISCLOSURE

32. Under Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## XI.
## PRAYER

33.    For these reasons, Plaintiff asks that the court issue citation for
Defendants to appear and answer, and that Plaintiff be awarded a judgment
against Defendants for the following:

1)    Past and future pain and suffering;

2)    Past and future mental anguish;

3)    Past and future medical, pharmaceutical, life care, therapy, and
      treatment expenses;

4)    Past and future lost earning capacity;

5)    Past and future lost income;

6)    Past and future loss of enjoyment of life;

7)    Past and future disfigurement;

8)    Past and future physical impairment;

9)    All other economic damages allowed by law;

10)   Exemplary damages;

11)   Prejudgment and post-judgment interest at the maximum rate
      allowable by law;

12)   Costs of Court; and

13)   All other relief to which Plaintiff may be justly entitled, at law or in
      equity.

DATED the 22nd day of August, 2019.

Respectfully submitted,

*/s/ Christopher S. Hamilton*
Christopher S. Hamilton
State Bar No. 24046013
chamilton@hamiltonwingo.com
Stephen T. Blackburn
State Bar No. 24043555
sblackburn@hamiltonwingo.com
Ray T. Khirallah, Jr.
State Bar No. 24060091
rkhirallah@hamiltonwingo.com
Andrea L. Fitzgerald
State Bar No. 24081982
afitzgerald@hamiltonwingo.com

HAMILTON | WINGO LLP
325 N. St. Paul Street, Suite 3300
Dallas, Texas 75201
Telephone:  (214) 234-7900
Facsimile:  (214) 234-7300

**ATTORNEYS FOR PLAINTIFF**

DocuSign Envelope ID: B711EF45-D3A0-4F02-80EC-3791E11361AA

THIS MASTER SERVICE AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, RELEASE OF LIABILITY AND ALLOCATION OF RISK. BY EXECUTING THIS MASTER SERVICE AGREEMENT AND/OR COMMENCING THE WORK, XTO ENERGY INC. AND ITS LISTED AFFILIATES AND CONTRACTOR AGREE TO BE BOUND BY ALL OF THESE PROVISIONS.

## MASTER SERVICE AGREEMENT

THIS MASTER SERVICE AGREEMENT is made and entered into on   March 8, 2017        , between XTO ENERGY INC. and its affiliates, BARNETT GATHERING, LLC; ENGLISH BAY PIPELINE, LLC; FAYETTEVILLE GATHERING COMPANY; MOUNTAIN GATHERING, LLC; NESSON GATHERING SYSTEM, LLC; RINGWOOD GATHERING COMPANY; TREND GATHERING, & TREATING, LLC; and TIMBERLAND GATHERING, & PROCESSING COMPANY, LLC (individually and collectively "XTO"), legal entities having their principal places of business at 810 Houston St., Fort Worth, TX 76102, and M.E.C. Services
a LLC              having its principal place of business at 522 W. Mermod Street #721, Carlsbad, NM. 88220 ("Contractor"). XTO and Contractor are referred to herein individually as a "Party" and collectively as the "Parties."

The Parties acknowledge and agree as follows:

I.   Preamble.  This Master Service Agreement controls and governs the Work (as defined below) performed by Contractor Group (as defined below) for XTO. It may be used in conjunction with oral or written Work Orders (as defined below) between the parties. Only the particular terms included in this Master Service Agreement that have application to the type of Work that is covered by a particular Work Order will apply. This Master Service Agreement does not obligate XTO to order Work from Contractor and does not obligate Contractor to accept orders for Work from XTO.

II.   Definitions.

    2.1   "Affiliate" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlling, controlled by, or under common control with, such Party

    2.2   "Agreement" means this Master Service Agreement and any oral or written Work Orders between the Parties.

    2.3   "Contractor Group" shall mean individually or in any combination Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees, invitees and assignees.

    2.4   "Master Service Agreement" means this document standing alone:

    2.5   "Site" means the location or locations at which Contractor is performing the Work for XTO.

    2.6   "Subcontractor" means a party that Contractor engages to perform all or a part of the Work. References to Contractor in this Agreement will include, where appropriate, Contractor's Subcontractors.

    2.7   "Subsidiary" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlled by such Party.

*MSA with Listed Affiliates Version 3.2 (08/18/2016)*                                    Page 1 of 21

**Attachment 2**

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

2.8 "XTO Group" shall mean individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Contractor, Contractor Group, or its or their Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.

2.9 "Work" means everything to be provided or performed by the Contractor Group from time to time under this Master Service Agreement, or which has been provided or performed by Contractor Group, whether with or without a particular written or oral Work Order.

2.10 "Work Order" means the directions from XTO to Contractor, which may be oral (which may be followed by a writing within ten (10) days of the oral request) or written, to provide or furnish XTO with equipment (including, without limitation, equipment fabricated by the Contractor Group), material or services at a specific time, place and cost; such directions are incorporated in this Master Service Agreement by reference.

III. Conduct of Work.

3.1 Commencement of Work. When the terms of a Work Order for the materials, services and/or equipment desired by XTO are agreed upon, Contractor will commence furnishing same at the agreed time, and continue such operations safely, diligently and without delay, in strict conformity with the specifications and requirements contained herein and in such Work Order until complete.

3.2 Time and Quality. Time and quality of work shall be the essence of this Agreement.

IV. Responsibilities of the Parties.

4.1 Contractor's Responsibilities. Contractor, at its sole cost, risk and expense, will:

4.1.1 Furnish the services of all personnel required to perform and complete the Work.

4.1.2 Supply all machinery, equipment, tools, materials and expendable construction items, transportation, and supplies that are required to perform and complete the Work, unless XTO has agreed in writing to supply such materials and equipment.

4.1.3 Provide all necessary safeguards for the protection of all aspects of the Work and all persons employed directly or indirectly by the Contractor Group or third parties.

4.1.4 Obtain and provide evidence to XTO of all permits and licenses that are required to perform the Work, except for air permits and EPA permits.

4.1.5 Pay (i) any occupation or similar taxes which arise from the Work and which are required under the law or for which XTO has elected not to give the Contractor a direct pay certificate or other valid exemption certificate; (ii) all payroll taxes, all taxes measured by payrolls, all assessments or charges for social security purposes, unemployment compensation, old-age pensions or benefits, annuities or other charges that are required to be made with respect to or measured by the wages and salaries of persons employed by the Contractor Group that are imposed by or under the laws of either the United States or the State in which the Work is performed; and (iii) for all labor and materials furnished by the Contractor Group for the Work. Contractor shall protect, defend, indemnify and

DocuSign Envelope ID: 8711EF46-03A0-4F02-80EC-3791E11381AA

hold harmless the XTO Group from and against the failure of any member of the Contractor Group to pay such taxes. Contractor agrees to require this same agreement from each member of the Contractor Group and to indemnify the XTO Group for any breach or failure to obtain such agreements.

4.1.6 Immediately notify XTO of any incident arising out of or relating to the Work resulting in death or personal injury to any person or property damage or loss, including, but not limited to, environmental damages or losses, and will furnish XTO a written report within 72 hours of the incident detailing all relevant facts. Contractor will furnish XTO with a copy of all documents made by Contractor to any insurer or governmental authority regarding such accidents or occurrences.

4.1.7 Be responsible for: (i) the training, supervision and safety of all persons within the Contractor Group who are performing the Work, (ii) the Work performed and (iii) all materials, services and equipment provided by the Contractor Group or any member thereof, and any vendor or supplier of the Contractor Group incidental to the Work.

4.1.8 If applicable, in accordance with the Occupational Safety and Health Administration's Hazard Communication Standard, 29 CFR 1910.1200, Contractor shall provide to XTO all Material Safety Data Sheets (MSDS) applicable to the equipment/materials purchased at or before the time of the initial shipment. All updates to such MSDS shall be provided to XTO with the first shipment after updating.

4.2 XTO's Responsibilities. XTO will:

4.2.1 Furnish materials and equipment that XTO has agreed to furnish.

4.2.2 Provide access to the Site.

4.2.3 Provide other goods and/or services as agreed in writing by the Parties.

V. Payment and Audit Rights.

5.1 Contract Price. XTO will pay Contractor for the Work based on the rate and terms in the Work Orders. Unless otherwise provided in this Agreement and subject to Article IX hereof and retention rights permitted by law, payment will be due 30 days after XTO's receipt of a correct invoice and supporting documentation therefor.

5.2 Audit Rights. Contractor will preserve documentation related to a Work Order for three years after completion of the Work Order. XTO may audit Contractor's compliance with this Agreement and any Work Order hereunder and Contractor will provide XTO access to Contractor's documentation, personnel and facilities in support of any such audit and will permit XTO to reproduce any of the documentation. Contractor will cause any subcontractors to preserve documentation and allow XTO to audit to the same extent. XTO will bear its own costs to perform an audit, but will not be liable for Contractor's or subcontractor's costs resulting from an audit.

VI. Work Standards, Warranties, Quality, Title and Storage

6.1 Work Standards. All Work by the Contractor Group will be performed with due diligence, in a good, safe and workmanlike manner, using skilled, competent and experienced workers and supervisors and in accordance with good oilfield servicing or other applicable business or professional practices. All materials, equipment, supplies or

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11351AA

manufactured articles furnished, fabricated or used by the Contractor Group in the performance of the Work will be selected and used with good oilfield or other applicable business or professional practices for their respective purposes, and shall be of first quality. Contractor agrees to ascertain, before performing any Work, whether any drawings and specifications are at variance with applicable law and good engineering and operational practices, notify XTO of such variances, and with XTO's agreement ensure that any necessary changes are made.

6.2     <u>XTO Provided Equipment.</u> Contractor agrees to inspect all materials and equipment furnished by XTO and will notify XTO of any apparent defects therein before using the materials and equipment. Should the Contractor Group use such materials and equipment without notifying XTO of any such defect, Contractor will be deemed to have assumed all risk and liability for any mishap that may occur in operations conducted hereunder by reason of failure or defects in such material and equipment. Contractor will not be liable for claims due solely to latent defects.

6.3     <u>Warranties.</u>

    6.3.1     <u>Services.</u> For services provided, Contractor warrants that the Work will be and has been completed in accordance with this Agreement, the applicable Work Order, and the most current applicable codes and industry standards, using its best professional efforts and in accordance with the most current generally accepted standards in the applicable industry, business or profession.

    6.3.2     <u>Equipment/Materials.</u> For equipment and materials purchased or leased by XTO from the Contractor Group, Contractor, in addition to the other provisions hereof, warrants (i) that the equipment and materials will be free and clear of all liens, taxes, security interests or encumbrances; (ii) good and merchantable title to the equipment and materials; (iii) that the equipment and materials will be free from defects in material and workmanship for a period of 12 months following the date of installation, or the Contractor or manufacturer's standard warranty, whichever is longer; (iv) that the equipment and materials will conform to applicable specifications, drawings, designs, and samples; (v) that the equipment and materials will be fit for their usual, customary, and generally intended purpose; and (vi) with respect to non-custom equipment and materials, that such equipment and materials will be of no less than ordinary quality.

    6.3.3     In addition to the express warranties set forth above, the Work and all equipment and materials will be covered by all implied warranties available at law.

    6.3.4     In addition to all rights and remedies available to XTO by law, all of which are reserved, if XTO discovers any defect or deficiency in the Work within the warranty period, and XTO has notified Contractor of the defect or deficiency within a reasonable period of time after its discovery, Contractor, at its sole expense and risk, shall at XTO's option either (1) promptly repair, re-perform, or replace the defective or deficient Work (and shall provide all labor, materials, equipment and other services necessarily incidental to effecting such correction of the defect or deficiency) or (2) refund any payments made by XTO for the Work. The repaired, re-performed, or replaced Work shall be warranted on the same basis as provided above for the longer of the balance of the applicable warranty period or 6 months from the date XTO accepts the repair, re-performance, or replacement.

    6.3.5     <u>Warranties of Others.</u> Contractor shall use its best efforts to ensure that any warranties available from Subcontractors or manufacturers are assigned or otherwise made available to XTO, and shall upon request deliver to XTO a copy

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

of each written warranty provided by Subcontractors, manufacturers, or any other third parties. If a warranty from Subcontractor, manufacturer, or third party cannot be assigned to XTO, Contractor shall bring and diligently pursue a warranty claim for XTO's benefit if XTO so requests.

6.4     <u>Title; Risk of Loss</u>. Title to any equipment and materials (excluding Contractor's tools, equipment and rented items) provided under this Agreement will pass to XTO: (i) upon payment therefor by XTO; or (ii) upon delivery to XTO's premises, agent or other site designated by XTO, whichever occurs earlier. Risk of loss or damage to equipment and materials shall pass to XTO upon delivery to XTO's premises or an agent designated by XTO. Notwithstanding the foregoing, the transfer of title or risk of loss to XTO does not constitute XTO's acceptance of any equipment and materials.

6.5     <u>Storage and Bailment of XTO's Equipment and Materials</u>. If Contractor stores any of XTO's materials and/or equipment under one or more Work Orders, Contractor shall keep and provide those records that may be requested by XTO including, but not limited to, an inventory of such materials and/or equipment, by location, at the end of each calendar year, or more frequently if requested by XTO. Contractor may charge XTO a fee for storing the materials and/or equipment only if that fee is agreed to by XTO in writing. Contractor shall: (i) store such materials and/or equipment in a clean, dry, and secure location, unless otherwise agreed in writing by XTO, (ii) segregate such materials and/or equipment from items belonging to entities other than XTO, if the materials are of a nature which may be segregated, and (iii) mark, or otherwise indicate in a manner to make it evident to Contractor's creditors, that such materials and/or equipment belong to XTO. XTO shall have access to such materials and/or equipment during Contractor's normal business hours, and Contractor shall use reasonable commercial efforts to provide XTO access to such materials, when requested by XTO, during non-business hours. Delivery of XTO's materials and/or equipment is considered by both parties to be a bailment and not subject to the terms and conditions of the Uniform Commercial Code or similar law, as the same may be codified in applicable state law pertaining to sales and/or secured transactions. If materials and/or equipment stored by Contractor under one or more Work Orders are lost, stolen or damaged, Contractor shall be responsible for the full replacement value of such materials and/or equipment. If the Contractor stores any of XTO's materials and/or equipment, Contractor assumes all risk and liability for any property damage to the material and/or equipment during the period of such storage.

VII.     <u>Patents, Software and Infringement</u>.

7.1     Contractor represents and warrants that the use or construction of any and all tools, equipment and other materials furnished by the Contractor Group and used in the Work does not infringe on any license or patent issued to, or applied for by, a third party.

7.2     If equipment or materials are provided with embedded or included software or firmware, whether created by Contractor or a third party, Contractor grants to XTO a perpetual, royalty-free, worldwide and irrevocable right to use the software in connection with use of the equipment or materials, which right is extendable to any person or entity permitted by XTO to use the equipment or materials and which is fully transferable in connection with any sale or other transfer of the equipment or materials. If access to or use of the software or firmware requires XTO to "accept" terms and conditions through use of "click-wrap", "shrink-wrap" or any other means, XTO may "accept" in order to access or use the software or firmware, however such terms and conditions will be of no force or effect and XTO's use rights shall be governed solely by this Agreement. Embedded or included software or firmware shall be treated as "equipment or materials" for all purposes.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

7.3     Infringement Notice and Indemnification. If any member of the XTO Group, or an Affiliate, is made the subject of any claim or lawsuit based on the alleged infringement or misappropriation of any third-party patent, copyright, trade secret or other proprietary or intellectual property right by reason of any aspect of the Work provided by the Contractor Group hereunder, Contractor shall defend, indemnify and hold harmless the XTO Group against any and all claims or lawsuits arising out of or based on the actual or alleged infringement or misappropriation of any such third-party right by Contractor Group. The indemnities set forth in this Section shall include, without limitation, all penalties, awards, and judgments; all court and/or arbitration costs; legal costs and the costs of defense; and other reasonable out-of-pocket costs, fees or expenses incurred in connection with such claims or lawsuits. Contractor shall have the right to control the defense of any litigation, and to settle or compromise all claims and lawsuits subject to its indemnity; however, Contractor may not settle or compromise such claim or lawsuit without the written consent of XTO if any settlement or compromise (a) requires XTO to admit fault or wrongdoing, or to part with any property right or interest, assume any obligation or make any payment not indemnified, or (b) subjects XTO or XTO Affiliate to any injunction. Subject to the foregoing, XTO shall have the right, at its option and expense, but not the obligation, to retain advisory counsel to represent its interests in defending any such claim or lawsuit.

If any action results in an injunction against any member of XTO Group with respect to the Work performed under any Work Order, Contractor agrees that it shall, at its sole expense, either (1) procure for XTO the right to continue using the infringing subject matter, or (2) replace or modify the same so that it becomes non-infringing with substantially equivalent performance. If neither (1) nor (2) are possible, Contractor shall refund to XTO all amounts paid under the applicable Work Order.

VIII.   Confidentiality. Contractor will treat, and will cause the Contractor Group to treat, all information obtained in the performance of the Work as confidential, and Contractor will not, and will ensure that the Contractor Group will not, divulge such information to any person or entity without the prior written consent of XTO. Contractor will not, and Contractor will ensure that the Contractor Group will not, use any such information except in connection with the Work and will not disclose details of the Work to any third party except to those who are to perform the Work, and then only to the extent that it is required to perform the particular portion of the Work. Contractor will take, and Contractor will ensure that the Contractor Group will take, all reasonable precautions to safeguard any documents containing proprietary information. The restrictions in this Section VIII shall not apply to any information: (i) which is at the time of disclosure in, or after disclosure falls into, the public domain through no fault of Contractor or any member of the Contractor Group; (ii) which is first received by Contractor from a third party who, insofar as is known to Contractor, is lawfully in possession of such information and not in breach of any contractual, legal or fiduciary obligation to XTO or the XTO Group; and (iii) disclosure of which, upon advice of counsel, Contractor reasonably deems necessary to comply with any legal or regulatory obligation which Contractor believes in good faith it has. If either Party or anyone to whom it transmits confidential information pursuant to this Agreement becomes legally required to disclose any such information, that Party shall provide the other Party with prompt written notice so that it may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the disclosing Party shall furnish only that portion of the confidential information which is legally required to be furnished in the opinion of the disclosing Party's counsel and no more.

IX.     Liens. Contractor will make timely and full payments to all workmen, materialmen and Subcontractors, insure that all members of the Contractor Group make timely and full payments to all workmen, materialmen and Subcontractors, and take all other action necessary to keep the Site and the Work free of liens. Contractor agrees to indemnify, protect, defend and hold harmless the XTO Group from and against all such charges, claims and liens unless caused by XTO's failure to pay Contractor. XTO may withhold payment of amounts due to any member of the Contractor

DocuSign Envelope ID: 6711EF46-D3A0-4F02-80EC-3791E11361AA

Group under this Agreement (including the applicable Work Order and any other Work Orders) and any other contract between XTO and Contractor until XTO has been furnished with proof satisfactory to it that either all amounts have been paid or Contractor has provided for satisfactory payment. If a lien arising from the Work attaches to the Site or the Work, XTO may, at its sole option, make any payment necessary to discharge the lien, and it may offset the amount of the lien, together with damages and costs, including court costs and reasonable attorneys' fees, that it incurs because of the lien or its discharge against any payment owing or to be owed to Contractor or any other member of the Contractor Group. Contractor will furnish, on request by XTO, receipts and releases with respect to the Work that show that costs and expenses of the Work have been paid and that no claims, liens, or rights to liens exist against the XTO Group or its property. Contractor agrees to require this same agreement from each of its Subcontractors and to defend and indemnify the XTO Group for any breach of such agreements by any of its Subcontractors.

## X.    RELEASE, DEFENSE, INDEMNITY AND HOLD HARMLESS.

### 10.1    Contractor's Obligations.

10.1.1    Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "Indemnifiable Claims") arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the Contractor Group, and/or loss of or damage to property or interests in property of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group.

10.1.2    To the extent not covered in Section 10.3, Contractor hereby further agrees to protect, release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

10.1.3    Contractor agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group and shall provide waivers of subrogation against all members of the XTO Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

DocuSign Envelope ID: B7§§EF46-D3A0-4F02-80EC-3791E§1361AA

**10.2    XTO's Obligations.**

10.2.1    XTO hereby agrees to release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group, and/or loss of or damage to property or interests in property of any one or more members of the XTO Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group.

10.2.2    To the extent not covered in Section 10.3, XTO hereby further agrees to protect, release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

10.2.3    XTO agrees that its indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group and shall provide waivers of subrogation against all members of the Contractor Group; or XTO may be self-insured. To the extent that applicable law prohibits monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

**10.3    Drilling of Oil or Gas Well.** Notwithstanding any provision in this Article X to the contrary (but expressly subject to Section 10.3.4 hereof) the following provisions will apply to operations involved in the drilling of an oil or gas well:

10.3.1    XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising from pollution or contamination below the surface of the land, seabed or water, resulting from blowout, fire, cratering, seepage or any other uncontrolled flow of oil, gas or mineral substance during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

10.3.2    XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against the loss or damage (i) to any geological formation, strata or oil or gas reservoir or minerals resource beneath the surface of the land or water, (ii) for the loss of or damage to any hole(s) or well(s), and (iii) for any impairment of any property rights or other interests in or to any oil, gas or minerals resources resulting from blowout, fire, cratering or any other cause, which may result during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

*MSA with Listed Affiliates Version 3.2 (08/18/2016)*                                    Page 8 of 21

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

10.3.3    If equipment or instruments of the Contractor Group become lost in the well, XTO will either recover them without cost to the Contractor Group or pay the Contractor Group for the equipment or instruments (depreciated to date of loss); PROVIDED, HOWEVER, IF THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE CONTRACTOR GROUP, XTO WILL NOT BE LIABLE TO ANY EXTENT FOR THE LOSS AND THE CONTRACTOR GROUP WILL RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE XTO GROUP FROM AND AGAINST ANY LOSS, COST OR EXPENSE, INCLUDING COURT COSTS AND REASONABLE ATTORNEY'S FEES, SUFFERED OR INCURRED BY THE XTO GROUP THAT ARISES OR RESULTS THEREFROM. Contractor will be required to furnish backup documentation to support the calculation of reimbursable costs for equipment or instruments lost in the hole.

10.3.4    To the extent any provision in this Section 10.3 applicable to the drilling of an oil or gas well is in conflict with any other provision of this Article X, then such provision of this Section 10.3 will prevail, but if there is no such conflict the entire Article X will apply.

10.4    SPECIAL PROVISION FOR NEW MEXICO AND WYOMING. THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO OR WYOMING, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY. To the extent this Article X is governed by New Mexico or Wyoming law, then the provisions therein shall be read not to include indemnification for one's own negligence, gross negligence or willful misconduct.

10.5    SPECIAL PROVISIONS FOR LOUISIANA. THE FOLLOWING PROVISIONS APPLY WHERE WORK IS TO BE PERFORMED IN OR OFFSHORE LOUISIANA, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY.

10.5.1    To the extent Article X is governed by Louisiana law, then (1) the provisions therein shall be read not to include indemnification for one's own negligence and (2) the Indemnifiable Claims for which indemnity is owed, pursuant to Article 10.1. and 10.2.1, shall include claims arising out of contractual indemnity obligations owed to Contractor Group or XTO Group, as applicable.

10.5.2    The Parties acknowledge and agree that all Work performed by Contractor and its employees pursuant to this Agreement is an integral part of and is essential to the ability of XTO to generate XTO's goods, products or services. Without limiting the foregoing, XTO and Contractor agree that XTO is and will be deemed a statutory employer of Contractor's employees for purposes of La. R.S. 23:1061(A)(3), as the same may be amended from time to time. In further consideration of the amounts to be received by Contractor pursuant to this Agreement, XTO and Contractor agree that Contractor will be responsible for the payment of all compensation benefits paid to or for the benefit of Contractor's employees. Contractor and/or Contractor's underwriters agree that they will have no right to seek and will not seek any contribution or indemnity from XTO for any compensation benefits paid by Contractor and/or Contractor's underwriters.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

XI.   Insurance.

11.1   Coverages.   Subject to the provisions of Section 11.2, Contractor will secure and maintain, and will require its Subcontractors to secure and maintain, during the term of this Agreement the following insurance coverages with limits not less than the amounts specified, and with companies satisfactory to XTO who are authorized to do business in the jurisdiction where the Work is to be performed.

11.1.1   Worker's Compensation Insurance with limits of not less than $1,000,000 or the statutory requirements of State laws (as well as Federal laws, if applicable), whichever is greater, which shall include Employer's Liability Insurance with limits of not less than $500,000 per incident. If the Work is to be performed in the states of North Dakota, Ohio, Washington or Wyoming, "Stop-Gap" Employer's Liability Insurance with limits of not less than $500,000 per incident must be procured. Such Worker's Compensation insurance must be endorsed, if applicable, to cover claims under the United States Longshore and Harbor Workers' Compensation Act, the Outer Continental Shelf Lands Act, the Jones Act and general maritime law, with an "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam."

11.1.2   Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

11.1.3   Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by Contractor, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence.

11.1.4   Umbrella Insurance (with coverage at least as broad as the underlying policy) over that required in 11.1.2 and 11.1.3 with minimum limits of $5,000,000, and specifically including contractual liability.

11.1.5   If the Work requires the use of marine vessels or other watercraft, Contractor will carry, or require the owner of the watercraft to carry: (i) all risk hull insurance in an amount equal to the vessel's declared value and (ii) protection and indemnity insurance, including, but not limited to, collision liability, removal of debris, towing liability and coverage for Admiralty benefits and damages under the Jones Act and general maritime law, in a minimum amount of $1,000,000 combined single limit per occurrence, and that in all such insurance the "other than owner clause" will be deleted.

11.1.6   If the Work requires the use of aircraft, Contractor will carry, or require the owner of the aircraft to carry: (i) all risks hull insurance in the amount equal to the replacement value of the aircraft and (ii) bodily injury liability, including passenger liability and property damage, of not less than $10,000,000 combined single limit per occurrence.

11.2   Actual Insurance.   Notwithstanding the minimum coverages specified in Sections 11.1.1-11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor shall provide hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1-11.1.5 above.

DocuSign Envelope ID: B711EF46-D3A0-4F62-80EC-3791E11361AA

11.3    Limit Adjustments. XTO may at any time upon prior written notice require Contractor to increase the limits set forth to such amounts as inflation, industry practice or other factors indicate are reasonable. The foregoing insurance requirements will apply whether or not required by any other provision of this Agreement and the limits of coverage do not alter the indemnities and allocation of responsibilities in this Agreement.

11.4    Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

11.5    Certificate of Insurance. Contractor or Contractor's insurance carrier(s) will furnish certificates of insurance satisfactory to XTO, reflecting the insurance requirements of this Article XI, as evidence that the required insurance coverage has been obtained and maintained, before commencing the Work. The certificate shall be on a form approved by the Texas Department of Insurance.

No waiver of the provisions of this Article XI will be inferred from any failure on the part of XTO to object or complain about any failure of Contractor or Contractor's insurance carrier to provide such certificate of insurance. Contractor shall provide XTO notice and evidence of any modification to, or extension or cancellation of, Contractor's required insurance coverage.

XII.    Independent Contractor. Contractor will be an independent contractor with respect to the Work, and in all cases, Contractor shall be the employer or common law employer of all workers performing the Work. Neither Contractor nor any Subcontractor or any member of the Contractor Group, nor their respective workers, officers, employees or agents, will be deemed the agent, representative, employee, common law employee or servant of XTO. Subject to the provisions of Section 10.5.2, if applicable, Contractor, the Contractor Group and any of its or their Subcontractors will have complete and sole control over their respective workers and employees and the details of the Work performed and the methods by which the Work is accomplished, it being understood that XTO is interested only in the results of the Work. Contractor specifically agrees that it shall ensure that no member or members of the Contractor Group are improperly classified as independent contractors or as the common law employees of the XTO Group, and shall defend, indemnify and hold harmless the XTO Group from and against any Indemnifiable Claims as a result of arising out of any failure by the Contractor Group to comply with this Section XII or Section IV above. Notwithstanding the foregoing:

      (i)    XTO retains the right to (a) review a list, in advance of the commencement of the Work, of the names the Contractor Group workers who will be performing work on an XTO location, and (b) refuse entry to or request that the Contractor Group replace any unsatisfactory worker who is or may be performing work at an XTO location. XTO shall have the right to immediately remove from its location a worker of the Contractor Group whose behavior is unsafe or otherwise unacceptable, rude, harassing or threatening.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

(ii)     XTO shall not be precluded from asserting any borrowed employee or statutory employer defense or other defense that may exist.

(iii)    All materials, equipment and services shall meet the approval of XTO and shall be subject to a general right of inspection.

XIII.   Compliance with Laws and XTO Regulations and Policies.

13.1    Safety.  Safe operations are of paramount importance to XTO. Accordingly, XTO has established a safety and environmental program for its own employees and requires that all members of the Contractor Group have an appropriate safety and environmental program. Contractor understands that the Work may involve danger and risk of injury, and the inherent danger is understood and assumed by Contractor.  Contractor shall have sole responsibility for the safety of the Contractor Group employees, agents, and representatives, and acknowledges and agrees that XTO has no duty to supervise the work of, or to provide a safe place to work for, the employees, agents or representatives of the Contractor Group.  Contractor shall adequately instruct all its employees and those of its Subcontractors or other members of the Contractor Group in the use of safety equipment and proper work procedures for the purpose of doing everything reasonably possible to protect against (i) personal injury or illness and (ii) damage to property or equipment.  Contractor shall take all reasonable measures necessary to provide safe working conditions.  Contractor shall furnish XTO promptly with a report of any and all accidents involving the Work (whether involving Contractor or the Contractor Group) and shall notify all government agencies of accidents as required by law.  Contractor agrees to provide XTO with any reasonable information about any member of the Contractor Group that XTO requests for its internal use in evaluating the safety and environmental record of the Contractor Group.

13.2    XTO Regulations and Policies.  Contractor will comply with and will cause the Contractor Group to comply with all applicable XTO rules and regulations (as revised from time to time) that relate to the safety and security of persons and property, protection of the environment, housekeeping and plant work hours, including, but not limited to, XTO's Drug, Alcohol, Firearms, Vehicle Search and Contraband Policy attached hereto as Attachment 1 and XTO's Safety, Health and Environmental Policy attached hereto as Attachment 2, both of which are incorporated by reference herein.  Depending upon the scope and nature of the Work to be performed, XTO may require Contractor or the Contractor Group to execute other XTO safety policies or to complete policy questionnaires or surveys.  XTO may revise, amend or alter its rules or policies or adopt new or additional rules or policies and they will become a part of this Agreement when Contractor receives a copy of them.

13.3    Compliance with Laws.  Contractor will comply, and will cause the Contractor Group to comply, with all federal, state, tribal, and local laws, rules, regulations, ordinances, executive orders and other applicable requirements of all governmental agencies having jurisdiction over the Work which now or in the future may be (i) applicable to all Work performed hereunder or (ii) applicable to Contractor's or the Contractor Group's business, equipment, workers or employees engaged in or in any manner connected with its performance hereunder.  All of the provisions of this Agreement shall be expressly subject to all applicable laws, orders, rules and regulations of any governmental body or agency having jurisdiction over the premises, and all Work contemplated hereunder shall be conducted in conformity therewith.  Any provision of this Agreement which is inconsistent with any such laws, orders, rules or regulations shall be modified so as to conform therewith, and this Agreement, as so modified, shall continue in full force and effect.  For the purpose of the preceding sentences, "laws, orders, rules, or regulations" includes, but is not limited to, the duly enacted and effective regulations and ordinances

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

of any federally-recognized Indian or First Nations tribe. XTO and Contractor shall execute such documents, purchase orders and other instruments as may be reasonably required to conform with any applicable laws or orders. Contractor shall protect, defend, indemnify and hold harmless the XTO Group from and against any and all liabilities or penalties incurred, fees or fines assessed, or damages suffered as a result of the failure of Contractor Group to comply with this Section and/or any applicable laws (including, but not limited to, the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act), rules, regulations, ordinances, executive orders and other applicable requirements.

13.4   To the extent that Attachment 3, Equal Employment Opportunity Provision, Certification of Non-Segregated Facilities, and Employment of Qualified Disabled Individuals and Veterans, applies to this Agreement, Contractor will abide by Attachment 3, and will ensure that the Contractor Group abides by Attachment 3.

## XIV.   Miscellaneous.

14.1   **Attorneys' Fees.** If the Parties become involved in litigation, arbitration or mediation arising out of or related to this Agreement in which the services of an attorney or other expert are reasonably required, the prevailing Party will be fully compensated for the cost of its participation in such proceedings, including court costs, expenses and the reasonable costs incurred for attorneys' fees and experts' fees. Unless judgment goes by default, the attorneys' fee award will not be computed in accordance with any court schedule, but will be such as to fully reimburse all reasonable attorneys' fees actually incurred by the prevailing Party, regardless of the size of the judgment and regardless of whether the payment of all or a portion of such fees was contingent upon the outcome of the arbitration or litigation.

14.2   **Term.** This Master Service Agreement will be for a term of 1 year from the date hereof and from year to year thereafter until terminated. Either Party may terminate this Master Service Agreement at any time, with or without cause; provided, however that Contractor will provide 30 days prior written notice of any such termination. Any termination will not affect any rights or obligations that have accrued under this Agreement.

14.3   **Force Majeure.** A delay in or failure to perform by a Party, other than the payment of money, will not constitute a default that exposes it to liability for breach if and to the extent the delay or failure to perform is unforeseeable and is caused by an occurrence beyond the reasonable control of the Party, including, but not limited to an act of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or requirement of any governmental authority that was unforeseeable; act of war, rebellion, terrorism, piracy or sabotage or damage resulting therefrom; fire, flood, storm, hurricane, tornado, explosion or accident; riots or strikes or other concerted acts of workers, whether direct or indirect; inability after diligent effort to obtain necessary licenses or permits; or any other cause, whether or not of the same class or kind as those specifically above named, which is not within the control of the Party and which, by the exercise of reasonable diligence, the Party is unable to prevent or remedy. If a condition of Force Majeure remains in effect for more than ten (10) days, XTO shall have the right to terminate the applicable Work Order without fee or penalty, and Contractor shall refund to XTO any prepaid amounts under such Work Order.

14.4   **Rebates.** All Work is to be performed on an arm's-length basis. Neither Contractor nor the Contractor Group will pay any commissions, salary or fees or grant any rebates or other remuneration or gratuity to any employee of XTO, any relative of an employee of XTO, or any representative or agent of XTO, other than gifts of nominal value and entertainment, meals, and social invitations that are customary and proper under the circumstances which do not place the recipient under obligation. The foregoing

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3781E11361AA

prohibition will not apply to the payment of salaries to employees of Contractor or the Contractor Group who are related to XTO employees, if employment of the relative is not related to XTO's business relationship with Contractor. If any employee of XTO should solicit a gift or gratuity from Contractor or the Contractor Group, Contractor agrees to notify the Controller of XTO of such act. It is further understood that failure by Contractor to comply with this policy regarding rebates may, among other remedies, result in the termination of this Agreement by XTO and may preclude any future dealings between the parties.

14.5     <u>Assignments and Subcontractors.</u>  Neither Party may assign this Agreement without the prior written consent of the other Party. Contractor may not subcontract its rights or duties under this Agreement, except to an Affiliate, without the prior written consent of XTO. Any assignment, delegation or subcontract in violation of this Section 14.5 will be void. Any consent given by XTO will not relieve Contractor of responsibility for performance of its obligations under this Agreement. Any assignee or Subcontractor of this Agreement shall expressly assume all obligations of Contractor hereunder, including, but not limited to, Contractor's indemnity obligations, upon acceptance of assignment of this Agreement, or subcontracting of the Work.

         Contractor shall ensure that its contracts with its Subcontractors contain provisions which are in conformity with and no less stringent than the provisions of this Agreement and the applicable Work Order.

14.6     <u>Waiver.</u>  The waiver by either Party of a breach or default by the other Party will not be deemed a waiver of any different or later breach.

14.7     <u>Conflicts.</u>  For conflicts between or among provisions in the Master Service Agreement and any oral or written Work Order, this Master Service Agreement controls over any written or oral Work Order. It is expressly understood and agreed that no provision of any delivery ticket, invoice, confirmation of purchase order, published rate schedule or other instrument used or provided by Contractor will supersede the provision of this Master Service Agreement or any other agreement to any extent, for any purpose.

14.8     <u>Applicable Law.</u>  This Agreement will be governed by the laws of the State of Texas, excluding the Texas rules on conflicts of law. For Work performed offshore, the provisions of this Agreement shall be construed in accordance with the General Maritime Law of the United States or, if not applicable, with the law of the state applicable to the Work.

14.9     <u>Consequential Damages.</u>  In no event will either Party be liable to the other under this Agreement for indirect, special, incidental, punitive or consequential damages, including, but not limited to, loss of profits, loss of use of assets or loss of product or facilities downtime. This Section 14.9, however, shall in no way limit or modify a Party's indemnity obligations including consequential damages associated with such indemnify obligations under Article X above.

14.10     <u>Captions.</u>  The captions used in this Agreement are for convenience only and will in no way define, limit or describe the scope or intent of this Agreement or any part thereof.

14.11     <u>Notices.</u>  All notices and other communications required by this Agreement to be in writing will be deemed duly given to a Party two business days after such notice or other communication is sent to such Party by registered or certified mail, return receipt requested, postage prepaid, addressed to the individual and address indicated for such Party in a Work Order or such other person as a Party may designate from time to time as their representative. A Party may send a notice or other communication to the other Party using any other means of delivery, including personal delivery, facsimile, telex, ordinary

DocuSign Envelope ID: 871 1EF46-D3A0-4F02-80EC-3791E11351AA

mail, or electronic mail, but no such notice or other communication will be deemed given unless and until it actually is received by such other Party. A Party may change the individual and/or address for notices by giving the other Party notice of such change in the manner set forth herein.

14.12   Entire Agreement. This Master Service Agreement, together with its Attachments and any written or oral Work Order between XTO and Contractor, as the case may be, are the entire agreement between the Parties on the subject matter referred to therein and supersede all prior negotiations, agreements, discussions and correspondence. This Master Service Agreement may not be changed orally, but may be changed only by an amendment, signed by both Parties, which specifies the change, addition or deletion. An amendment that is not in writing is void. This Master Service Agreement, when executed by Contractor, supersedes any previous contracts between Cross Timbers Operating Company, Cross Timbers Production Company, or XTO and Contractor identified as a Master Service Agreement or Master Field Service Agreement.

14.13   Severability. If any provision of this Master Service Agreement is held to be unenforceable, this Master Service Agreement will be deemed to be amended to the extent necessary to make it enforceable, or, if necessary, this Master Service Agreement will be deemed to be amended to delete the unenforceable provision or portion thereof. If any provision is deleted or amended, the remaining provisions will remain in full force and effect.

14.14   Use of Name and Marks. Contractor shall not use XTO's or Exxon Mobil Corporation's name, trade name, or trademarks, or those of any of XTO's Affiliates or other entity owned or controlled by Exxon Mobil Corporation, in any advertising or communication to the public, or make publicity releases or announcements concerning the Work Order, Services, or related activities, in any format without XTO's prior express written consent.

DocuSign Envelope ID: B711EF46-D3A0-4F02-8CEC-3791E11361AA

IN WITNESS WHEREOF, the Parties have caused this Master Service Agreement to be executed by their duly authorized representatives as of the date first above written.

**XTO ENERGY INC.**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**M.E.C. Services**

Representative: _Mark Comer_
(Authorized Representative Signature)

Name: Mark Comer

Title: owner

Date: March 8, 2017

Federal Tax I.D. # 45-5254333

**BARNETT GATHERING, LLC**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**TREND GATHERING & TREATING, LLC**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

**ENGLISH BAY PIPELINE, LLC**
**FAYETTEVILLE GATHERING COMPANY**
**MOUNTAIN GATHERING, LLC**
**NESSON GATHERING SYSTEM, LLC**
**RINGWOOD GATHERING COMPANY**
**TIMBERLAND GATHERING & PROCESSING COMPANY**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: Katie Baker

Title: Supervisor, Master Contracts

Date: March 8, 2017

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

*MSA Attachment 1*

### XTO ENERGY INC.
### DRUG, ALCOHOL, FIREARM, VEHICLE SEARCH AND CONTRABAND POLICY

XTO PROHIBITS THE USE, MANUFACTURE, SALE, TRANSFER, OR POSSESSION OF ALCOHOLIC BEVERAGES, ILLEGAL AND NON-PRESCRIBED DRUGS, DRUG PARAPHERNALIA, EXPLOSIVES, FIREARMS AND OTHER WEAPONS ON ANY XTO PREMISES OR ANY WORK SITE WHERE XTO'S EMPLOYEES, CONTRACTORS, VENDORS OR SUBCONTRACTORS ARE ENGAGED

IF PRESCRIPTION MEDICATION MUST BE BROUGHT TO ANY SUCH WORK LOCATION, THE MEDICATION MUST BE KEPT IN ITS PRESCRIPTION CONTAINER UNTIL USED. ANY USE OF A PRESCRIBED MEDICATION MUST BE IN STRICT ACCORDANCE WITH THE PRESCRIPTION. NO ONE MAY WORK ON AN XTO WORK LOCATION IF HE/SHE IS TAKING MEDICATION THAT INTERFERES WITH HIS/HER ABILITY TO PERFORM HIS/HER JOB SAFELY. THE USE OF ANY MEDICATION THAT MIGHT INTERFERE WITH AN INDIVIDUAL'S ABILITY TO PERFORM HIS/HER JOB SAFELY MUST BE REPORTED TO THE SENIOR XTO OFFICIAL ON SITE, OR, IF NO XTO OFFICIAL IS ON SITE, TO XTO'S ENVIRONMENTAL, HEALTH AND SAFETY DEPARTMENT.

ANY PERSON WHO IS FOUND DEPARTING XTO'S WORK LOCATION IN POSSESSION OF XTO OR A LANDOWNER'S PROPERTY THAT IS NOT AUTHORIZED IN WRITING FOR REMOVAL FROM XTO'S WORK LOCATION IS SUBJECT TO DISCIPLINARY ACTION, INCLUDING IMMEDIATE DISCHARGE, OR REMOVAL AND FUTURE PROHIBITION FROM THE PREMISES.

ENTRY INTO OR PRESENCE ON XTO'S JOB SITE BY ANY PERSON IS CONDITIONED UPON XTO'S RIGHT TO SEARCH THE PERSON AND PROPERTY OF ANY PERSON. AT ANY TIME, AND WITHOUT NOTICE, ANY PERSON, HIS/HER VEHICLE, OR PERSONAL PROPERTY IS SUBJECT TO SEARCH. PROPERTY MAY INCLUDE, BUT IS NOT LIMITED TO, THE FOLLOWING: WALLETS, PURSES, LOCKERS, BAGGAGE, OFFICES, DESKS, TOOL BOXES, CLOTHING, AND VEHICLES. ANY ILLEGAL CONTRABAND OR UNAUTHORIZED PROPERTY FOUND MAY BE TURNED OVER TO THE APPROPRIATE AUTHORITIES.

XTO RESERVES THE RIGHT TO REQUIRE ANY PERSON ON AN XTO LOCATION TO SUBMIT TO A DRUG TEST OR TO REQUIRE ANY CONTRACTOR, VENDOR, OR SUB-CONTRACTOR TO TEST ITS EMPLOYEES. REFUSAL TO SUBMIT TO OR FAILING A DRUG TEST WILL RESULT IN THE IMMEDIATE REMOVAL FROM THE LOCATION.

CONTRACTORS, VENDORS, OR SUB-CONTRACTORS VIOLATING THIS POLICY MAY BE SUBJECT TO AN IMMEDIATE CANCELLATION OF THEIR CONTRACT.

IN THE EVENT CONTRACTOR, VENDOR, OR SUB-CONTRACTOR ARE PERFORMING WORK SUBJECT TO DEPARTMENT OF TRANSPORTATION (DOT) REGULATIONS, SUCH PARTIES WILL SUBMIT A COPY OF THEIR ALCOHOL AND DRUG TESTING PROGRAMS FOR REVIEW BY XTO. XTO MAY USE A THIRD PARTY TO REVIEW THE PROGRAMS, AND IN THE EVENT THE PROGRAMS ARE NOT SUFFICIENT BY DOT STANDARDS, THE COST OF ANY SUBSEQUENT REVIEW FOR COMPLIANCE SHALL BE PAID BY SUCH PARTIES.

SHOULD YOU HAVE ANY QUESTIONS REGARDING THIS POLICY, PLEASE SEE YOUR XTO CONTRACT REPRESENTATIVE.

DocuSign Envelope ID: B711EF45-D3A0-4F02-80EC-3791E11361AA

## XTO ENERGY INC. SAFETY, HEALTH AND ENVIRONMENTAL POLICY

XTO is committed to protecting the environment and the health and safety of employees, contractors, local communities, and others who may be impacted by its business activities. XTO requires its contractors to actively participate, and to cause its affiliates, subcontractors, and other members of the Contractor Group to actively participate, in the establishment of a safe working environment as follows:

## CONTRACTOR AND THE CONTRACTOR GROUP'S RESPONSIBILITIES

- Perform all work in a safe, environmentally sensitive, and workmanlike manner and provide necessary safety precautions and equipment for their employees, contractors, consultants, and other personnel.

- Report all injuries and incidents (including property damage) immediately (including a written report within 72 hours of the accident) to the XTO supervisor or designated alternate.

- Report all spills and releases immediately (including a written report within 72 hours of the incident) to the XTO supervisor or designated alternate and communicate to XTO any other environmental risks or exposures.

- Instruct its employees in the applicable XTO standards and practices.

- Conduct its operations in a manner that protects human health and safety, minimize adverse environmental impacts, and mitigates unavoidable impacts on the environment.

- Comply with all applicable safety, health, and environmental laws and regulations, and apply responsible standards where law or regulations do not exist.

- Have in place an active injury and loss prevention program and advise and train line managers in safety, health, and environmental requirements.

- Provide its employees with adequate training in safety, health, and environmental matters, and hold each employee accountable for compliance with this policy.

- Provide technical and legal support to those line managers responsible for compliance with this policy.

- Require timely communication between employees and their supervisors regarding safety, health, and environmental issues.

- Require employees to communicate their concerns to management about any unresolved safety, health, and environmental risks they might have identified in the Contractor's operations.

- Monitor, evaluate and report performance in safety, health, and environmental protection.

- Provide a copy of this policy to the Contractor's contractors and notify them that they and their subcontractors will be expected to perform all work for the Contractor in compliance with this policy.

- Emphasize the importance of maintaining safety and environmental standards in economically-competitive situations.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

## CONTRACTOR AND THE CONTRACTOR GROUP'S PERSONNEL (EMPLOYEE/ SUBCONTRACTOR / CONTRACTOR / CONSULTANT) RESPONSIBILITIES:

Each employee shall demonstrate a positive attitude toward injury-prevention and environmental protection and company property. Each employee is responsible for:

* Performing their job safely, for their personal safety, the safety of fellow workers, and the protection of the environment and company property. This includes the proper use of safety equipment and strict adherence to safe work practices.

* Understanding all safety and environmental policies pertinent to their job responsibilities.

* Performing safety and environmental assessments.

* Actively participating in safety and environmental meetings.

* Reporting promptly all unsafe conditions and practices (including those of contractors), to their supervisor.

* Reporting every spill/release to their supervisor.

DocuSign Envelope ID: B711EF46-D3A0-4F02-80EC-3791E11361AA

*MSA Attachment 3*

## EQUAL EMPLOYMENT OPPORTUNITY PROVISION, CERTIFICATION OF NONSEGREGATED FACILITIES, AND EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS

The term "Contractor" as used herein shall mean the party designated as Contractor, of which this Attachment is a part. The term "Agreement," as used herein shall mean the foregoing agreement to which this Attachment is a part. This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Work, including but not limited to Executive Order 11246.

1.    **EQUAL EMPLOYMENT OPPORTUNITY PROVISION.**

If the value of this Agreement exceeds $10,000, then during the performance of this Agreement, Contractor agrees as follows:

A.    The contract clause prescribed in Section 202 of Executive Order No. 11246 of September 24, 1965 (41 CFR 60-1), is incorporated by reference into this Attachment.

B.    Contractor further agrees and certifies that, if the value of this Agreement is $50,000 or more and Contractor has 50 or more employees, and is not otherwise exempt, Contractor will:

(1) Develop a written affirmative action compliance program for each of his establishments in accordance with the requirements of 41 CFR 60-1.40 and 60-2. This program shall be developed within 120 days of the commencement of a covered contract, and shall be maintained as long as required by law or regulation.

(2) File annually, complete and accurate reports on Standard Form 100, Equal Employment Opportunity information Report EEO-1, in accordance with the requirements of 41 CFR 60-1.7, and otherwise comply with and file such other compliance reports as may be required under Executive Order 11246, as amended, and Rules and Regulations adopted thereunder.

2.    **CERTIFICATION OF NONSEGREGATED FACILITIES.**

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this Agreement. The term "segregated facilities" means any waiting room, work areas, restrooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion or national origin, because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for the specific time period) it will obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for the specific time period).

DocuSign Envelope ID: 8711EF46-D3A0-4F02-80EC-3791E11361AA

"NOTICE TO PROSPECTIVE VENDORS AND SUBCONTRACTORS
REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities, as required by 41 CFR 60-1.8, must be submitted prior to the award of any contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause (41 CFR 60-1.4). The Certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually or annually). (NOTE: The penalty for making false statements is prescribed in 18 (U.S.C. 1001)."

### 3.    EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS.

Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-471 (Section 503 of the Rehabilitation Act of 1973, as amended), any Contractor with a contract over $10,000 in value must establish an affirmative action program to employ and advance in employment qualified disabled individuals.

Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran, veteran of the Vietnam era, recently separated veteran, or other protected veteran in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-250 (Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, as amended), each Contractor with a contract over $100,000 must take affirmative action to employ and advance in employment qualified special disabled veterans, recently separated veterans, veterans of the Vietnam Era, veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized; veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded pursuant to Executive Order No. 12985; or other protected veterans, and list with appropriate local employment service offices all suitable employment openings.

The additional contract clauses prescribed in 41 CFR 60-741.4 and 60-250.4 are incorporated by reference into this Attachment.

DocuSign
SECURED

## Certificate Of Completion

Envelope Id: B711EF46D3A04F0260EC3791E11361AA
Subject: XTO Energy Master Service Agreement with MEC Services, LLC
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 21 | Signatures: 5 | Envelope Originator: |
| Supplemental Document Pages: 0 | Initials: 0 | Sue King |
| Certificate Pages: 3 | | |
| AutoNav: Enabled | Payments: 0 | sue_king@xtoenergy.com |
| Envelopeld Stamping: Enabled | | IP Address: 158.26.65.165 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sue King | Location: DocuSign |
| 3/6/2017 9:45:46 AM | sue_king@xtoenergy.com | |
| Security Appliance Status: Connected | Pool: XTO | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mark Comer<br>markecomer@gmail.com<br>owner<br>M.E.C. Services<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Mark Comer*<br>Using IP Address: 199.195.169.45 | Sent: 3/6/2017 9:46:44 AM<br>Viewed: 3/7/2017 2:30:34 PM<br>Signed: 3/8/2017 9:56:07 AM |
| Electronic Record and Signature Disclosure:<br>Accepted: 3/7/2017 2:30:34 PM<br>ID: e0c22166-5acc-45a5-8b46-39621f5ad852<br>Company Name: ExxonMobil Production 10 | | |
| Katie Baker<br>katie_baker@xtoenergy.com<br>Supervisor, Master Contracts<br>XTO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Katie Baker*<br>Using IP Address: 158.26.2.165 | Sent: 3/8/2017 9:56:08 AM<br>Viewed: 3/8/2017 10:16:03 AM<br>Signed: 3/8/2017 10:16:38 AM |
| Electronic Record and Signature Disclosure:<br>Accepted: 3/8/2017 10:16:03 AM<br>ID: 36a5348d-2932-4d4f-865e-fe0d8645ebcf<br>Company Name: ExxonMobil Production 10 | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

## Notary Events

| Notary Events | | Timestamp |
|---|---|---|

## Envelope Summary Events

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/8/2017 9:56:08 AM |

Status: Completed

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 3/8/2017 10:16:04 AM |
| Signing Complete | Security Checked | 3/8/2017 10:16:38 AM |
| Completed | Security Checked | 3/8/2017 10:16:38 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 12/30/2016 6:30:07 AM
Parties agreed to: Mark Corner, Katie Baker

### ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

Exxon Mobil Corporation (ExxonMobil) [1] uses the DocuSign service to collect signatures, endorsements, and approvals for corporate purposes. DocuSign may be used by ExxonMobil to conduct corporate business endorsements and approvals or to gather electronic signatures from 3rd parties for business purposes. Please read the information below and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button.

**Acknowledging your access and consent to receive materials electronically**
By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference.
- I am authorized to do the specific type of work (approve, endorse, etc.) in the country where I am physically located when using DocuSign

**Getting paper copies**
You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing the document.

**How to contact Exxon Mobil Corporation:**
For email address changes or if you have questions about a document you receive please contact the sending ExxonMobil Business organization.

[1] ExxonMobil and/or ExxonMobil Affiliates mean (a) Exxon Mobil Corporation or any parent of Exxon Mobil Corporation, (b) any company or partnership in which Exxon Mobil Corporation or any parent of Exxon Mobil Corporation now or hereafter, directly or indirectly (1) owns or (2) controls, more than fifty per cent (50%) of the ownership interest having the right to vote or appoint its directors or functional equivalents ("Affiliated Company") and (c) any joint venture in which Exxon Mobil Corporations, any parent of Exxon Mobil Corporation or an Affiliated Company has day to day operational control.

ACORD

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
8/30/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Debbie Aranda | | |
|---|---|---|---|
| Arthur J. Gallagher & Co. Six Desta Dr., Ste. 5900 Midland TX 79705 | PHONE (A/C, No, Ext): 806-748-2019 | | FAX (A/C, No): 866-446-7371 |
| | E-MAIL ADDRESS: debbie_aranda@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : New York Marine And General Insurance Company | | 16608 |
| INSURED MEC Services, LLC 6613 Ruby St NE Albuquerque NM 87109    MECSERV-01 | INSURER B : New Mexico Assurance Company | | 13673 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES          CERTIFICATE NUMBER: 998095567          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | PK201800010685 | 5/14/2018 | 5/14/2019 | EACH OCCURRENCE | $1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | X AI#XAI3G191 1212 | | | | | | MED EXP (Any one person) | $10,000 |
| | X WSB#AI3G191 1212 | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | X OTHER: Pollution Liab | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | AU201800012842 | 5/14/2018 | 5/14/2019 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | X AI#AI3G129  X WSB#AI3G129 | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | UM201800005526 | 5/14/2018 | 5/14/2019 | EACH OCCURRENCE | $5,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $5,000,000 |
| | DED  X RETENTION $10,000 | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y/N | | | 75031.108 | 7/20/2018 | 7/20/2019 | X PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Motor Truck Cargo | Y | Y | PK201800010685 | 5/14/2018 | 5/14/2019 | Property in Vehicles Catastrophe Limit Deductible | $500,000 $500,000 $5,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Certificate Holder is an Additional Insured as respects General Liability, Automobile, and Umbrella policies, pursuant to and subject to the policy's terms, definitions, conditions and exclusions. GL0202 (0413) Auto AU0077 (0113)

Waiver of Subrogation applies to certificate holder, as respects General Liability, Automobile, Workers Comp, and Umbrella policies, pursuant to and subject to the policy's terms, definitions, conditions and exclusions. GL0202 (0413) & Auto AU0077 (0113); WC WC000313 (0484).

The General Liability policy is primary and non-contributory.

Rented/Leased Equipment Limit $300,000 Ded. $1,000

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| XTO Energy 22777 Springwoods Village Parkway Spring TX 77389 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.    AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD